853 A.2d 280

SEABROOK VILLAGE, RESPONDENT–RESPONDENT,
v. JOHN MURPHY, PETITIONER–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 17, 2004—Decided July 21, 2004.

Before Judges PETRELLA, COLLESTER and FUENTES.

*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg,* attorneys for appellant (*Owen T. Hughes,* of counsel; *Gail M. Cookson,* on the brief).

*Archer & Greiner,* attorneys for respondent (*Arthur H. Jones* and *Robert J. Fogg,* on the brief).

The opinion of the court was delivered by

FUENTES, J.A.D.

Petitioner John Murphy appeals from the final decision of the New Jersey Department of Community Affairs (DCA), Bureau of

Homeowner Protection. In its decision, the DCA determined that Seabrook Village was legally entitled to cancel its Residence and Care Agreement with petitioner and discharge him from its facility for his (1) refusal to pay monthly service fees and (2) failure to execute a release of the Living Unit that he previously occupied.

This appeal requires us to answer two legal questions, namely: (1) whether the procedures employed by the DCA upholding Seabrook's cancellation of the Residence and Care Agreement comport with the requirements of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15; and (2) whether Seabrook can terminate petitioner's residency without establishing "just cause" pursuant to the Continuing Care Retirement Community Regulation and Financial Disclosure Act, *N.J.S.A.* 52:27D–344d and 344e and *N.J.A.C.* 5:19–6.5(c).

We now hold that a resident of a continuing care facility appealing his or her dismissal or discharge from such facility to the DCA is legally entitled to a "plenary hearing," as defined in *N.J.A.C.* 1:1–2.1. Such a hearing must be conducted by either the Commissioner of the DCA or by the Office of Administrative Law pursuant to the Commissioner's referral for adjudication. We further hold that a resident of a continuing care facility can be involuntarily discharged only upon the establishment of "just cause," as defined in *N.J.S.A.* 52:27D–344d and *N.J.A.C.* 5:19–6.5(c). Any waiver of "just cause" contained in an agreement entered into by a resident or any contractually crafted ground for removal not sanctioned by specific statutory or regulatory authority, is legally unenforceable and void as against public policy.

We will address these legal issues in the following factual context.

I

Erickson Retirement Communities, d/b/a Seabrook Village, operates a continuing care retirement community located in Tinton

Falls. Seabrook offers three types of living arrangements for its residents: (1) Independent Living Units; (2) Assisted Living Units; and (3) Care Center Units. The latter two are housed in the Extended Care Center. The Residence and Care Agreement contains the following descriptions of the Independent Living and Assisted Living Units:

*Independent Living Units.* The facility is planned to have approximately 1650 Independent Living Units within three (3) residential neighborhoods. Each residential neighborhood will be comprised of four (4) residential buildings containing Independent Living Units and one (1) community building. Each community building includes a dining room, classrooms, cardrooms, lounges and other common areas.

*Extended Care Center.* The Extended Care Center will house both the Assisted Living Units and the Care Center Units. Each floor of the Extended Care Center will include a dining room, a resident lounge, activity rooms and a bathing core. The Extended Care Center will be constructed in three (3) phases, with Phase One expected to become available in March, 2001. Phase Two expected to become available in March, 2004 and Phase Three expected to become available in March, 2007. All opening dates are approximate and may change according to changing in weather conditions [sic], market demands, etc. Until the Extended Care Center is opened, [SEABROOK VILLAGE] will enter into transfer agreements for its Residents with outside assisted living and nursing care centers.

Petitioner, in consultation with his son Michael Murphy,[1] decided to reside in one of Seabrook's Independent Living Units. Prior to signing any documents or making any payments, petitioner sought clarification as to the status of any deposit required. By letter dated February 17, 1999, Seabrook Executive Director Joan Carr assured petitioner that "[a]ll of these funds are fully refundable," both prior to and after petitioner moved into his unit.

On June 10, 1999, petitioner signed the Residence and Care Agreement with Seabrook and paid the required entrance fee of $149,000.[2] In addition to the entrance fee, the Agreement also

---

[1] Petitioner gave his son power of attorney over the administration of his personal financial affairs.

[2] Despite Carr's earlier unqualified assurances, section 7.6 of the Agreement limits the amount of the refund payable after occupancy by transferring to the

required petitioner to pay a Monthly Service Fee of $1,290. Michael signed as guarantor of his father's financial obligations to Seabrook.

In May 2001, petitioner agreed to a transfer from his Independent Living Unit to an Assisted Living Unit located in the Renaissance Gardens facility. This unit had been marketed as requiring an entrance fee of $150,000. When Michael inquired about the $1,000 deposit differential, he was told that his father's initial $149,000 would be sufficient.

After the move, Michael alleges that he discovered promotional materials from Seabrook offering Assisted Living Units to the general public with an entrance fee of only $99,000. He immediately contacted Seabrook to complain about a number of problems pertaining to the level and quality of care petitioner was receiving at the new unit and requested a $50,000 refund from the original $149,000 entrance fee deposit.

Seabrook refused to refund the excess funds, referring petitioner and his son to section 7.3 of the Agreement which specifically provides that the entrance fee shall not be refunded or decreased "due to any temporary or permanent transfer, [by a resident] for whatever reason, during the Term of this Agreement." In this light, by letter dated June 18, 2001, Michael wrote to Carr to document his complaints about the deficient conditions in the Assisted Living Unit and to reiterate his demand for a $50,000 refund. He concluded this letter by emphasizing that he: (1) would not sign the release for occupancy of his father's original Independent Unit; and (2) would not continue to pay the Monthly Service Fee, "until such time as the many concerns I have raised are adequately addressed and both my father and I feel absolutely comfortable that [Renaissance Gardens] is the best place for him to be."

departing resident the market risk of Seabrook obtaining a qualified replacement willing to pay an equal or greater entrance fee.

On October 9, 2001, Michael and his counsel met with representatives of Seabrook in an attempt to amicably resolve the ongoing disagreement. By letter dated October 24, 2001, petitioner authorized Seabrook to re-subscribe the Independent Living Unit "with an entrance fee of not less than $149,000." [3] According to petitioner's counsel, there were twenty individuals on the waiting list to subscribe. The unit had been vacant since June 12, 2001.

Despite this apparent resolution of the dispute, by letter dated February 14, 2002, Seabrook notified petitioner of its intention to terminate his residency effective sixty days from his receipt of the notice. The notice also attached a statement of account indicating an arrears of $47,255.64, noting that the last payment petitioner made was on June 14, 2001, for $5,355.27.[4]

The termination notice cited section 12.2 of the Agreement as providing the legal authority for the removal. That section reads as follows:

12.2 Termination by SEABROOK VILLAGE.

SEABROOK VILLAGE may terminate this Agreement in the manner provided below. Resident may request a hearing to contest SEABROOK VILLAGE'S decision to terminate the Agreement. Such hearing shall be held pursuant to the New Jersey Administrative Procedure Act and the Uniform Administrative Practice Rules.

12.2.1 SEABROOK VILLAGE may terminate this Agreement by giving sixty (60) days notice to Resident of SEABROOK VILLAGE'S intention to terminate.

12.2.2 SEABROOK VILLAGE may terminate this Agreement by giving Resident less than sixty (60) days notice if there is "just cause" for termination. The term "just cause" shall mean, but shall not be limited to, a good faith determination in writing, signed by the Executive Director and Medical Director of the Community, that Resident is a danger to himself or others while remaining in the Community. The written determination shall state: (1) that the determination is made in good faith, (2) the reasons supporting the determination, (3) the basis for the conclusion

---

[3] The parties also reached a tentative understanding concerning disputed refurbishing charges.

[4] The account statement reflecting this outstanding balance is dated March 1, 2002. It represents an accumulation of service charges, including the Monthly Service Fee. The last statement included in the record is dated July 1, 2002 and reflects a balance of $72,453.94.

that there is no less restrictive reasonable alternative to dismissal, discharge or cancellation for abating the danger posed by Resident, and (4) an explanation as to why the danger is such that a notice period of less than sixty (60) days is required. It shall also be "just cause" if Resident is unable to pay the Monthly Service Fee and SEABROOK VILLAGE has used Resident's entire Entrance Fee to provide services to Resident. For purposes of determining whether SEABROOK VIL-LAGE has used Resident's entire Entrance Fee to provide services to Resident, SEABROOK VILLAGE shall determine the unused portion of Resident's Entrance Fee (if any), which is defined as the difference between the Entrance Fee paid and the lesser of (a) the fees generally charged by SEABROOK VILLAGE to provide services and care to Resident, or (b) based upon the per capita cost to the Community of providing services and care to Resident calculated as (i) no more than two percent (2%) of the Entrance Fee for each month Resident occupies, or is entitled to occupy, a Living Unit, (ii) no more than four percent (4%) of the Entrance Fee for each month Resident occupies, or is entitled to occupy, an Extended Care Unit at the Community, and (iii) no more than ten percent (10%) of the Entrance Fee as a one-time charge for processing and refurbishing. If the Entrance Fee is depleted within ninety (90) days of Resident's failure to pay the Monthly Service Fee, SEABROOK VILLAGE may not require Resident to vacate the Community before ninety (90) days from the date of failure to pay. During this time, Resident shall pay SEABROOK VILLAGE a reduced Monthly Service Fee based on Resident's income.

By letter dated March 25, 2002, Michael responded to Seabrook's termination notice disputing the alleged $47,255.64 delinquency in his father's account and reiterating his demand for a $50,000 credit based on the original $149,000 entrance fee. This prompted a response from Seabrook asserting, in part, that,

[b]y operation of our contract, and previous sixty day notice, our Agreement will end on April 16 [2002]. You must pay your father's balance by 5:00 p.m. on April 16 or pick him up. If you do not, we will drive him to your home that evening and should arrive between the hours of 6:00 p.m. to 11:00 p.m. The cost of after-hours transportation will be added to the account.

Confronted with this impasse, petitioner appealed Seabrook's action to the DCA, demanding "a full administrative hearing" pursuant to *N.J.A.C.* 5:19–6.5(e). Seabrook agreed to permit petitioner to continue to reside at its facility pending the outcome of the administrative appeal.[5]

---

[5] Although the record is silent as to the continuation of this agreement pending the outcome of this appeal, we note that petitioner has not sought any relief pursuant to *R.* 2:9–7. We thus presume that petitioner remains in possession *pending our decision.*

At the request of the DCA, the parties submitted proposed adjudicatory facts. Thereafter, based only on the parties' written submissions, Stewart P. Palilonis, Manager of Planned Real Estate Development in the Bureau of Homeowner Protection, issued the Agency's Findings of Adjudicatory Facts, finding in pertinent part that: (1) petitioner had refused to pay the Monthly Service Fee from June 14, 2001 to February 14, 2002; (2) petitioner had violated the terms of the Agreement by failing or refusing to sign a release of the Independent Living Unit when he was transferred to the Assisted Living Unit; (3) Seabrook proved "just cause" for terminating the Agreement; and (4) Seabrook was justified in discharging petitioner.

Against this factual backdrop we will now address the legal issues presented.

## II

### *Legal Grounds for Termination of Residency*

Petitioner argues that Seabrook did not have the legal authority to terminate his residency because it failed to establish "just cause" within the meaning of *N.J.S.A.* 52:27D–344d and *N.J.A.C.* 5:19–6.5(c). Seabrook maintains, however, that *N.J.S.A.* 52:27D–334a(7), *N.J.A.C.* 5:19–6.4(a)7 and section 12.2.1 of the Residence and Care Agreement authorize it to terminate petitioner's residency without "just cause," provided that the resident receives a sixty-day notice of Seabrook's intent to terminate the residency. The Attorney General, on behalf of the Commissioner of the DCA, urges us to reject Seabrook's argument and hold that a resident of a continuing care facility cannot be involuntarily discharged without the provider or operator establishing "just cause" under the Act.

We begin our analysis of this issue by acknowledging the obvious tension created by two subsections found within *N.J.S.A.* 52:27D–344.

Subsection 344a mandates that a residency agreement contain, at a minimum, ten separate provisions, including,

[a] statement providing that the agreement may be canceled upon giving at least 60 days' notice *by the provider or the resident*, except that if an agreement is canceled by the provider because there has been a good faith determination in writing, signed by the medical director and the administrator of the facility, that a resident is a danger to himself or others, only notice that is reasonable under the circumstances is required[.]

[*N.J.S.A.* 52:27D–344a(7) (emphasis added).]

By contrast, subsection 344d provides in pertinent part:

*No agreement for care shall permit dismissal or discharge of the resident from the facility prior to the expiration of the agreement without just cause for the removal.* For the purposes of this act, "just cause" means but is not limited to a good faith determination in writing, signed by the medical director and the administrator of the facility, that a resident is a danger to himself or others while remaining in the facility. The written determination shall state: (1) that the determination is made in good faith; (2) the reasons supporting the determination that the resident is a danger to himself or others; (3) the basis for the conclusion that there is no less restrictive alternative to dismissal, discharge or cancellation, as the case may be, for abating the dangerousness of the resident; and (4) the basis for the conclusion that the danger is such that a notice period of less than 60 days is appropriate.[6]

[Emphasis added.]

Thus, when compared side by side, subsections 344a(7) and 344d appear inconsistent. In resolving this ostensible conflict, we will be guided by well established principles of statutory construction. As we have recently noted,

statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' We are further guided by the express instruction of the Supreme Court: It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms.

[*State in the Interest of S.S.*, 367 *N.J.Super.* 400, 406, 842 *A.*2d 904, 908 (App.Div. 2004) (citations omitted).]

In our view, subsection 344a(7) imposes a procedural require-ment upon the provider or operator of a continuing care facility to notify a resident, at least sixty days in advance, of its intention to

---

[6] *N.J.A.C.* 5:19–6.5(c) mirrors this statutory language.

seek his or her involuntary removal from the facility. Subsection 344d sets out "just cause" as the only substantive legal basis for the resident's removal and provides for a notice period of less than sixty days under the appropriate circumstances. Thus, subsections 344a(7) and 344d are intended to operate in tandem, describing a resident's procedural and substantive rights. We are satisfied that the public policy underpinning the Act supports this conclusion.

In 1986, the Legislature adopted the Continuing Care Retirement Community Regulation and Financial Disclosure Act. *N.J.S.A.* 52:27D–330. In so doing, the Legislature recognized that "continuing care retirement communities [were then] [7] becoming an important and increasingly preferred alternative for the long-term residential, social and health care needs of New Jersey's senior citizens." *N.J.S.A.* 52:27D–31. The Legislature therefore directed the DCA to establish a comprehensive regulatory scheme to monitor the operations of these facilities. *Ibid.* It did so because "tragic consequences can result to senior citizens when a continuing care provider becomes insolvent or unable to provide responsible care." *Ibid.*

Pursuant to this legislative charge, *N.J.S.A.* 52:27D–358, the Commissioner of the DCA regulates almost every aspect [8] of the continuing care industry, i.e., requirements for and certification of operational authority, marketing, entrance and services fees, content and scope of residential agreements, financial responsibility

---

[7] According to statistics found on the New Jersey Department of Labor's website, an estimated 1,123,841 people over the age of sixty-five resided in New Jersey in 2003. U.S. Bureau of the Census, Population Division, *Estimates of Resident Population by State: July 1, 2003*, http:llwww.wnjpijn,net/OneStopCareerCenter/LaborMarketInformation/1mi021stp2003.htm (last visited July 1, 2004). The life expectancy of this age group is 16.51 years. Pressler, *Current N.J. Court Rules*, Appendix I (2004).

[8] The operator or provider of services must also obtain the appropriate licensure from the Department of Health and Senior Services for health care services provided by the facility. *N.J.S.A.* 52:27D–359.

standards and administrative structural requirements. *N.J.A.C.* 5:19–1.1 to –9.9. This regulatory framework compliments the equally comprehensive legislative scheme set out in *N.J.S.A.* 52:27D–330 to –360.

As we noted in *Starns v. American Baptist Estates of Red Bank,* 352 *N.J.Super.* 327, 337, 800 *A.*2d 182, 188 (App.Div.2002), "[a] continuing care facility provides more for each resident than a place to live." The overarching public policy of the Continuing Care Act is the protection of our State's older citizens, who have reached a point in their lives when they are unable to fully function without some level of personal support and medical assistance. Although the Act's main thrust is the financial stability of these facilities, there is also a clear legislative preoccupation with ensuring that the residents of these facilities receive quality care commensurate with their personal needs and financial resources. A key component of that care is the provision of a stable, secure and safe environment where residents and their families can plan the remainder of the residents' lives without the looming prospect of displacement based on the unilateral actions of the provider or operator.

Construing *N.J.S.A.* 52:27D–344a(7) as conferring upon the operators or providers of these facilities the unfettered authority to disrupt this stability by involuntarily displacing a resident, merely by providing a sixty-day termination notice, runs directly counter to this legislative scheme and does violence to the Act's core purpose, the protection of the resident. This approach would also undermine the DCA's oversight role by permitting the removal of a resident without the due process protection envisioned in *N.J.S.A.* 52:27D–344d: "A resident may request a hearing to contest a facility's decision to dismiss or discharge the resident."

Conversely, requiring a provider or operator to establish "just cause" as a prerequisite for the involuntary removal of a resident, furthers the legislative policy of protection, while giving the provider or operator the authority to remove residents who are no

longer capable of safely functioning within the facility's programs' parameters or otherwise endanger the safety or undermine the security of other residents or staff. *N.J.S.A.* 52:27D–344d.

■ Because the statutory requirement of "just cause" is intended to protect residents from arbitrary or ill-motivated displacement, any contractual provision that seeks to circumvent, waive or otherwise undermine this statutory protection by crafting an independent ground for removal, is unenforceable and void as against public policy. *N.J.S.A.* 52:27D–344f; *N.J.A.C.* 5:19–6.5(h).

Courts in our State have consistently reached similar conclusions in other areas where, as here, there is a clear public policy in favor of protecting a particularly vulnerable population. *Vasquez v. Glassboro Service Ass'n, Inc.,* 83 *N.J.* 86, 98, 415 *A.*2d 1156, 1162 (1980) (invalidating on public policy grounds a migrant worker contract that provided for the worker's summary ejection from employer-provided housing in the event of his discharge); *Sacks Realty Co. v. Shore,* 317 *N.J.Super.* 258, 269, 721 *A.*2d 1011, 1016–17 (App.Div.1998) (invalidating waiver of statutory protections in connection with condominium conversion); *Cardona v. Eden Realty Co.,* 118 *N.J.Super.* 381, 288 *A.*2d 34 (App.Div.), *certif. denied,* 60 *N.J.* 354, 289 *A.*2d 799 (1972) (exculpatory clauses, void as against public policy in residential leases).

■ Against the backdrop of these legal principles, we now hold that a provider or operator of a continuing care facility, seeking to involuntarily remove or discharge a resident, must establish "just cause" as that term is defined in *N.J.S.A.* 52:27D–344d. We further hold that section 12.2.1 of the Seabrook Residence and Care Agreement, which authorizes Seabrook to discharge and remove a resident merely by giving a sixty-day advance notice violates the "just cause" provisions in *N.J.S.A.* 52:27D–344d and *N.J.A.C.* 5:19–6.5(c), and is legally void and unenforceable as against public policy.

### The Actions of the DCA

■ Acting upon petitioner's appeal from Seabrook's decision to terminate his residency, the DCA determined that Seabrook had established "just cause" under *N.J.S.A.* 52:27D–344d and *N.J.A.C.* 5:19–6.5(c). This "decision" by the DCA was reached without conducting an evidentiary hearing and is facially devoid of legal analysis. In short, this "decision" constitutes an utter abdication of the DCA's responsibilities under the Continuing Care Act.

All parties in this appeal agree that the matter must be remanded to the DCA Commissioner for a full hearing as envisioned by the statute. *N.J.S.A.* 52:27D–344d. We now hold that this hearing must be conducted as a "plenary hearing," as that term is defined in *N.J.A.C.* 1:1–2.1. The Commissioner has the option of conducting the adjudicatory proceeding or referring the matter to the Office of Administrative Law.

The Commissioner's findings must be supported by specific references to the evidence in the record and conclusions of law must be supported by the appropriate authority.

Reversed and remanded. We do not retain jurisdiction.