800 A.2d 182 (2002)
352 N.J. Super. 327
Lester STARNS, Robert Sudano, Lisa Burgo, Luther Sroka, Huseyin Uzunalioglu, Nick Fugaro, Lori Ann Fugaro, Jo-Ann Fitzpatrick, Millie Forino, and Audrey LeRoy, Plaintiffs-Appellants,
v.
AMERICAN BAPTIST ESTATES OF RED BANK, t/a the Navesink House and the Navesink Gables, Inc., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 2002.
Decided June 27, 2002.
*183 R. Bruce Freeman, Westfield, argued the cause for appellants (Woehling & Freeman, attorneys; Mr. Freeman, of counsel and on the brief).
David A. Kotler argued the cause for respondent (Dechert, Price & Rhoads, attorneys; Mr. Kotler, Bruce W. Clark and Christopher J. Kelly, Princeton, on the brief).
Before Judges KING, CUFF and WINKELSTEIN.
The opinion of the court was delivered by CUFF, J.A.D.
In this appeal, we must decide whether the demolition of a thirty-three unit apartment building to allow construction of an addition to an existing continuing care retirement community constitutes retirement of the apartment building from residential use and good cause to evict the tenants of the apartment building. We hold that it does and affirm.
Defendant American Baptist Estates of Red Bank (American Baptist), t/a The Navesink House (Navesink House), operates a continuing care retirement community at 40 Riverside Avenue in Red Bank. Navesink House offers living units featuring a continuum of care for senior citizens sixty-five years of age and older in a variety of living units, including independent living, licensed residential health care, and skilled nursing. Navesink House maintains both an on-site medical treatment facility and a full-time medical staff. These units and certain community facilities are located in a twelve-story building.
Navesink House is located in the Waterfront Development zoning district of Red Bank. The adjacent property is a five-story apartment building containing thirty-three units known as the Twin Gables. Most of the remaining tenants have moderate incomes and pay relatively modest rents, generally under $1000 per month.
American Baptist acquired the Twin Gables with the express purpose of demolishing the existing apartment building and constructing an addition to Navesink House. In November 1999, American *184 Baptist applied for a use variance, various bulk variances and site plan approval to effectuate its expansion plan. It proposes to construct a new five-story building which will contain thirty-two additional independent living units, an underground parking facility, an indoor pool, café, lounge, library, media room and other community spaces. The addition will be connected to the existing Navesink House. The initial proposal included independent living units of 1000 square feet with full kitchens, washers and dryers, and two baths. We have been advised that since the trial judge considered this matter, American Baptist has revised its plan for the new independent living units by increasing the size of each unit. On completion the entire facility as planned would have 170 independent living units.
To accomplish the proposed expansion, American Baptist sent each tenant of the Twin Gables notices of eviction on July 31, 1999. Each letter stated as follows:
The existing Gables building is being permanently retired from the residential market. We recognize that this will result in the need for you to relocate. We apologize for the inconvenience that this will cause you, but we must give this Notice to you under N.J.S.A. 2A:18-61.1(h). You must vacate your apartment no later than February 28, 2001.
Because American Baptist failed to provide a copy of each letter to the Borough of Red Bank and the Department of Community Affairs, a second letter was sent to each tenant on January 19, 2001. This letter stated that each lease was terminated as of July 19, 2002. It further stated that the building was being retired from residential use "so that the property may be redeveloped and integrated into the adjacent Navesink House Continuing Care Retirement Community." At the time this notice was sent, seventeen of the thirty-three apartments were occupied. We were informed at oral argument that ten apartments remain occupied.
On August 8, 2000, Lester Starns, Robert Sudano, Lisa Burgo, Luther Sroka, Huseyin Uzunalioglu, Nick Fugaro, Lori Ann Fugaro, Jo-Ann Fitzpatrick, Millie Forino, and Audrey LeRoy (the tenants) filed a complaint and obtained an order to show cause to enjoin the eviction proceedings. Because the judge found that the July 1999 notice of eviction failed to comply with the Anti-Eviction Act, N.J.S.A. 2A:18-61.1, he declined to address whether American Baptist's planned expansion qualified as "retirement from residential use." See Sacks Realty Co. v. Batch, 248 N.J.Super. 424, 426, 591 A.2d 660 (App. Div.1991) (punctilious compliance with all statutory eviction procedures required). New notices were sent in January 2001; the eighteen-month notice period expires on July 19, 2002.
Having sent complying notices, Judge D'Amico addressed the substantive issue of whether the proposed addition to Navesink House qualifies as good cause for eviction. On April 20, 2001, Judge D'Amico held that the addition to the Navesink House is not the substitution of one residential use for another. Therefore, he ruled that American Baptist may move to evict the remaining tenants at the end of the eighteen-month notice period.
N.J.S.A. 2A:18-61.1 to -61.12, generally referred to as the Anti-Eviction Act, provides substantial protections to a residential tenant. As long as the tenant continues to pay the rent and complies with obligations assumed in the lease, the tenant may not be evicted except for good cause as established by statute. 224 Jefferson Street Condominium Ass'n v. Paige, 346 N.J.Super. 379, 383, 788 A.2d 296 (App.Div.), certif. denied, 172 N.J. 179, 796 A.2d 896 (2002). Indeed, this court *185 has observed that "[t]he effect of [the Anti-Eviction Act] is to create a perpetual tenancy, virtually a life interest, in favor of a tenant of residential premises covered by the Act as to whom there is no statutory cause for eviction under N.J.S.A. 2A:18-61.1." Center Ave. Realty, Inc. v. Smith, 264 N.J.Super. 344, 350, 624 A.2d 996 (App.Div.1993).
Soon after N.J.S.A. 2A:18-61.1 and -61.2 were enacted, this court observed that the Anti-Eviction Act was the legislative response "to the absence of any statutory limitations upon the reasons a landlord may utilize to evict tenants from comfortable quarters where they have not created any problems." Bradley v. Rapp, 132 N.J.Super. 429, 432, 334 A.2d 61 (App.Div. 1975). We further noted that the Legislature recognized "that this has resulted in frequent unfair and arbitrary residential ousters and citing the critical housing shortage, the act proposes to limit evictions to `reasonable grounds' and `suitable notice.'" Id. at 432-33, 334 A.2d 61.
One of the reasonable grounds recognized by the Legislature is permanent retirement of a building from residential use. N.J.S.A. 2A:18-61.1(h) provides that
No lessee or tenant ... may be removed by the Superior Court from any house, building, mobile home or land in a mobile home park or tenement leased for residential purposes ... except upon establishment of one of the following grounds as good cause:
* * *
h. The owner seeks to retire permanently the residential building ... from residential use....
In 1986, the Legislature specifically addressed permanent retirement of premises from residential use by increasing the notice period to tenants of buildings to be permanently retired from residential use from six months to eighteen months, N.J.S.A. 2A:18-61.2, and creating presumptions and conditions on the permanent retirement of premises from residential use, N.J.S.A. 2A:18-61.1b. These amendments were designed to address disturbing trends in real estate development, including the conversion of rental residential units to condominium or cooperative units and the renovation of rental residential units and re-offering at increased rent levels. The 1986 amendments were premised on the following legislative findings:
a. Acute State and local shortages of supply and high levels of demand for residential dwellings have motivated removal of blameless tenants in order to directly or indirectly profit from conversion to higher income rental or ownership interest residential use.
b. This has resulted in unfortunate attempts to displace tenants employing pretexts, stratagems, or means other than those provided pursuant to the intent of State eviction laws designated to fairly balance and protect rights of tenants and landlords.
* * *
d. It is in the public interest of the State to maintain for citizens the broadest protections available under State eviction laws to avoid such displacement and resultant loss of affordable housing, which, due to housing's uniqueness as the most costly and difficult to change necessity of life, causes overcrowding, unsafe and unsanitary conditions, blight, burdens on community services, wasted resources, homelessness, emigration from the State and personal hardship, which is particularly severe for vulnerable seniors, the disabled, the frail, minorities, large families and single parents.

[N.J.S.A. 2A:18-61.1a(a)(b) and (d).]
*186 The tenants contend that the expansion project contemplated by Navesink House simply substitutes one residential use for another. It emphasizes the plan to locate up to thirty-two independent living units in the structure which will be constructed on the site of the Twin Gables. American Baptist responds that a continuing care retirement community is fundamentally different from an open market residential rental building and does not qualify as a "residence" under sub-section (h) of the Anti-Eviction Act.
The Anti-Eviction Act does not define the terms "residence" or "residential use." The Act itself applies only to residential tenants. An examination of the scope of the Anti-Eviction Act's protections provides some assistance in interpreting the terms "residence" and "residential use" as used in section 61.1(h). Occupancy of a dwelling unit does not make the occupant a residential tenant under the protection of the Anti-Eviction Act. For example, the occupant of a dwelling unit on a farm is not a residential tenant and protected by the Anti-Eviction Act when the occupant has leased the fields and farm structures as well as the farmhouse. Harden v. Pritzert, 178 N.J.Super. 237, 241-42, 428 A.2d 927 (App. Div.1981). Similarly, a hospital which leased apartments at a nearby apartment building for use by some of its medical personnel was not protected by the Anti-Eviction Act. We reasoned that "the purpose of the hospital's tenancy here is at best an institutional and residential hybrid neither envisioned nor addressed by the act." Morristown Mem. Hosp. v. Wokem Mortgage & Realty Co., 192 N.J.Super. 182, 186, 469 A.2d 515 (App.Div.1983).
We have also held that week-to-week occupancy of a room in a motel or YMCA does not qualify the occupant as a residential tenant. Francis v. Trinidad Motel, 261 N.J.Super. 252, 618 A.2d 873 (App. Div.) (guest at motel for indeterminate time not a residential tenant), certif. denied, 133 N.J. 437, 627 A.2d 1143 (1993); Poroznoff v. Alberti, 168 N.J.Super. 140, 141-42, 401 A.2d 1124 (App.Div.1979) (occupant of a room at YMCA had no legal status other than transient guest of a hotel). On the other hand, in Williams v. Alexander Hamilton Hotel, 249 N.J.Super. 481, 592 A.2d 644 (App.Div.1991), we held that the long-term occupant of a hotel room was a residential tenant and entitled to the protection of the Anti-Eviction Act. We emphasized that the hotel accommodations included full kitchen facilities, the family resided in the unit over two and one-half years, planned to remain in the unit indefinitely, and used none of the housekeeping services available to guests of the hotel. Id. at 483-84, 592 A.2d 644.
The legislative committee statements which accompany the 1986 amendments which specifically addressed the retirement of a building or residential units from residential use also shed some light on the intention of the Legislature. A statement to Assembly Bill No. 1840 emphasized that the Legislature was concerned about the conversion of apartments to condominiums and cooperatives. It stated that
[t]his bill would prevent landlords from using certain legal pretexts to eject tenants in order to make the building available for conversion to condominiums or cooperatives, or for subsequent rental at more lucrative rates.
These cases and the legislative history suggest that the character of the entire premises in which the dwelling unit is located must be considered.
Navesink House is a continuing care retirement community. As such, it is governed by a comprehensive legislative and regulatory scheme. N.J.S.A. 52:27D-330 *187 to -360; N.J.A.C. 5:19-1.1 to -9.9. "Continuing care" is defined as
the provision of lodging and nursing, medical or other health related services at the same or another location to an individual pursuant to an agreement effective for the life of the individual or for a period greater than one year, including mutually terminable contracts, and in consideration of the payment of an entrance fee with or without other periodic charges. An individual who is provided continuing care is not related by consanguinity or affinity to the person who provides the care.

[N.J.S.A. 52:27D-332c; N.J.A.C. 5:19-1.3.]
Occupants of a continuing care retirement community are referred to as residents, see N.J.S.A. 52:27D-332j; N.J.A.C. 5:19-1.3; however, a continuing care resident's terms of occupation and care differ markedly from a resident of an open market residential unit. For example, the operator of a continuing care retirement facility must obtain a certificate of authority from the Department of Community Affairs, N.J.S.A. 52:27D-333; N.J.A.C. 5:19-2.1 to -2.15. The operator or provider of services must also obtain the appropriate licensure from the Department of Health and Senior Services for health care services provided by the facility. N.J.S.A. 52:27D-359; N.J.A.C. 8:43-1.1 to -16.6. The agreement between the provider and the resident is also governed by statute. N.J.S.A. 52:27D-344. Notably, the prospective resident must qualify medically and financially before admission and the resident may be dismissed from the facility for good cause, including a determination that the resident is a danger to himself or others. N.J.S.A. 52:27D-344d; N.J.A.C. 5:19-6.5(c)(2). The agreement must also set forth a statement of fees that will be charged if the resident marries a person who is not a resident of the facility and the consequences if the spouse does not meet the requirements for entry to the facility. N.J.S.A. 52:27D-344a(6); N.J.A.C. 5:19-6.4(a)(6).
In addition, the agreement must describe the circumstances under which the resident shall be permitted to remain in the facility in the event of financial difficulties of the resident. N.J.S.A. 52:27D-344a(5); N.J.A.C. 5:19-6.4(a)(5). Furthermore, N.J.S.A. 52:27D-344e and N.J.A.C. 5:19-6.5(f) provide that inability to pay monthly maintenance fees is not good cause for dismissal until the entire unearned entrance fee plus any third-party insurance benefits received by the facility are earned by the facility. Significantly, good cause or just cause for dismissal from the facility is not governed by the Anti-Eviction Act but is governed by the Continuing Care Retirement Community Regulation and Financial Disclosure Act. The Act defines just cause and further provides that the resident may request a hearing to contest a facility's decision to dismiss or discharge the resident. The hearing shall be held pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -24, and the Uniform Administrative Practice Rules, N.J.A.C. 1:1-1 to -21.6. N.J.S.A. 52:27D-344d; N.J.A.C. 5:19-6.5(e).
A person or couple who wish to reside in Navesink House must be sixty-five years of age or older and must pay an entrance fee and a monthly service fee. Each unit, including the independent living units, contains an emergency call switch which is connected to the nurses station of the nursing care unit. Housekeeping is provided on a weekly basis including vacuuming of carpeted areas, cleaning of appliances, cleaning the bathrooms, and changing linen on the bed or beds. Visits with the medical director in the Navesink House clinic or in the licensed nursing care *188 unit are included without out-of-pocket charge to the residents after the resident has met the Medicare co-payment requirements. Meals are provided to all residents. Persons occupying independent living units may partake in one meal each day. Persons residing in residential health care units and nursing units receive three meals a day. Social, cultural, educational, recreational and spiritual activities are offered by Navesink House without additional charge. The use of various common facilities, such as the garden room, shuffleboard lounge, craft lounge, and deck, are without additional charge. When prescribed by the Medical Director, continuous nursing care is provided.
Residents of Navesink House are required to maintain health insurance prescribed by the provider. Residents must also present evidence of their current medical condition commensurate with the level of care for which they seek admission. An applicant may be denied admission based on the state of their health at the time of application. Furthermore, the resident grants a power of attorney to the provider for the provider to seek reimbursement for any expenses incurred for care due to any injury caused by another person or entity.
Although residents of a continuing care retirement community consider the facility their home, the nature of the facility, particularly the health care services available to every resident, leads us to conclude that a continuing care retirement community should not be considered a residential use for purposes of sub-section (h) of the Anti-Eviction Act.
A continuing care retirement facility provides more for each resident than a place to live. Certainly, the independent living units most resemble apartments in a multi-family building; yet there are notable differences. Certain amenities such as weekly maid and linen service are not typical services provided to residential tenants. Residential units are not equipped with an emergency call device connected to a nurses' station within the building. Tenants of residential units do not obtain health and medical services from the staff of their residential building. A tenant in an open market residential unit need not qualify medically to begin their tenancy or to purchase their unit, will not be moved from unit to unit as their health status changes, and does not need to qualify their spouse if they should marry after commencement of their tenancy. Finally, a residential tenant enjoys the protection of the Anti-Eviction Act; an owner of a condominium or cooperative can be displaced only upon non-payment of the mortgage and then only by the mortgagee.
Once a resident moves from an independent living unit to a living unit which offers more personal services and health care, the resemblance to an open market residential unit is more strained. Finally, once a resident enters a nursing unit or requires skilled nursing services, the resemblance to an open market residential unit is non-existent. Indeed, we surmise that the array of social, health and medical services available to the residents of a continuing care retirement community and the personnel required to provide those services are reasons why it is not a permitted use in the Waterfront Development zone, a zone which otherwise permits single-family, duplex and multi-family garden apartment residential uses.
In light of the character of a continuing care retirement community and its substantial difference from a residential unit in a residential building, we hold that the construction of an addition to Navesink House which will include independent living units is not a residential use. Therefore, American Baptist has established that it proposes to retire permanently *189 the Twin Gables from residential use according to N.J.S.A. 2A:18-61.1(h).
We note, however, that American Baptist is not free to evict the remaining tenants following the expiration of the eighteen-month notice period on July 19. American Baptist's plan to demolish the Twin Gables and construct an addition to its existing building requires a use variance because a continuing care retirement community is not a permitted use. N.J.S.A. 2A:18-61.1b provides that the tenant cannot be evicted until the required land use approvals are obtained. In the companion case, American Baptist Estates of Red Bank, t/a The Navesink House v. Borough of Red Bank Zoning Board of Adjustment, A-2613-01T3, also decided today, we reversed the Law Division order approving the variances and remanded the application to the Red Bank Zoning Board of Adjustment for further consideration of the application. Thus, a warrant for removal may not issue until the required variances, design waivers and site plan approval are obtained.
Affirmed.