FIRST DIVISION 

November 21, 2005 

No. 1-04-3883

M. LOIS JACKIM, MEYER AND GERTRUDE KRUGLIK, and MARGERY SHURMAN,

Plaintiffs-Appellants,

v.

CC-LAKE, INC.,

Defendant-Appellee.

))))

)

)))

))

Appeal from the Circuit Court of 

Cook County

04 CH 11266

Honorable

Dorothy K. Kinnaird, Judge Presiding

JUSTICE McBRIDE delivered the opinion of the court:

The plaintiffs, M. Lois Jackim, Meyer and Gertrude Kruglik, and Margery Shurman, are residents of a new retirement community known as Classic Residence by Hyatt at The Glen (the Glen), which is owned, operated, and managed by the defendant CC-Lake, Inc., and situated north of Chicago in Glenview, Illinois, on land formerly occupied by the Glenview Naval Air Station.
(footnote: 1)  CC-Lake, Inc. (CC-Lake or provider), holds a permit under the Illinois Life Care Facilities Act (210 ILCS 40/1 
et seq
. (West 2002)) to contract to provide at the Glen a continuum of care known as "life care" to individuals who are at least 62 years old.  Each of the four plaintiffs executed a written "continuing care residency agreement" with the defendant in December 2002 and tendered entrance fees prior to moving into the life care facility.  The contract indicates that monthly fees collected from residents are intended to cover all of the Glen's operating costs and that at the end of any residency lasting longer than six months, CC-Lake will refund up to 90% of the resident's entrance fees.  CC-Lake may first deduct unpaid monthly fees, as well as "miscellaneous expenses" which include the costs of remediating a resident's alterations to the property beyond ordinary wear and tear.  On July 15, 2004, the plaintiffs filed a class action complaint in the circuit court of Cook County, in which they alleged CC-Lake and the Glen's residents formed landlord-tenant relationships, that the refundable portion of the entrance fees was a security deposit for rent and property damage, and that CC-Lake violated the Illinois Security Deposit Interest Act when it failed to credit residents with annual interest on those fees.  765 ILCS 715/0.01 
et seq.
 (West 2002).  The circuit court, however, granted CC-Lake's motion to dismiss the complaint with prejudice pursuant to section 2-615 of the Illinois Code of Civil Procedure.  735 ILCS 5/2-615 (West 2002).  CC-Lake's argument for dismissal was that the relationship between a life care provider and a life care facility resident is distinguishable from the traditional landlord-tenant arrangement, and that life care contracts are not leases within the meaning of the interest statute.  The residents argue on appeal that the terminology in CC-Lake's life care contract is not dispositive of their relationship and that the contract contains all the essential elements of a lease.

A section 2-615 motion poses the question of whether the complaint states a cause of action.  
Doe v. Chicago Board of Education
, 213 Ill. 2d 19, 21, 820 N.E.2d 418, 418-19 (2004).  A dismissal pursuant to section 2-615 is reviewed 
de novo
.  
Doe
, 213 Ill. 2d at 23-24, 820 N.E.2d at 421.  When reviewing the sufficiency of the allegations in the complaint, we accept as true all well-pled facts and all reasonably drawn inferences from those facts in favor of the plaintiff.  
Doe
, 213 Ill. 2d at 28, 820 N.E.2d at 423.  Accordingly, the complaint and attached contract are the source of all the facts set out below.  

The life care contract at issue was expressly "executed in accordance with the Illinois Life Care Facilities Act [(210 ILCS 40/1 (West 2002))] and will be in effect for the rest of [the contracting individual's] life" provided that individual complies with certain payment obligations and does not give CC-Lake "just cause" for termination.  The statute referenced in the contract indicates in relevant part:

"(c) 'Life care contract' means a contract to provide to a person for the duration of such person's life or for a term in excess of one year, nursing services, medical services or personal care services, in addition to maintenance services for such person in a facility, conditioned upon the transfer of an entrance fee to the provider of such services in addition to or in lieu of the payment of regular periodic charges for the care and services involved.

(d) 'Provider' means a person who provides services pursuant to a life care contract.

(e) 'Resident' means a person who enters into a life care contract with a provider, or who is designated in a life care contract to be a person provided with maintenance and nursing, medical or personal care services.

(f) 'Facility' means a place or places in which a provider undertakes to provide a resident with nursing services, medical services or personal care services, in addition to maintenance services for a term in excess of one year or for life pursuant to a life care contract. ***

(g) 'Living unit' means an apartment, room or other area within a facility set aside for the exclusive use of one or more identified residents.

(h) 'Entrance fee' means an initial or deferred transfer to a provider of a sum of money or property, made or promised to be made by a person entering into a life care contract, which assures a resident of services pursuant to a life care contract.

***

(j) 'Medical services' means those services pertaining to medical or dental care that are performed in behalf of patients at the direction of *** licensed *** professional and technical personnel.

(k) 'Nursing services' means those services pertaining to the curative, restorative and preventive aspects of nursing care ***.

(l) 'Personal care services' means assistance with meals, dressing, movement, bathing or other personal needs or maintenance, or general supervision and oversight of the physical and mental well-being of an individual, who is incapable of maintaining a private, independent residence or who is incapable of managing his person whether or not a guardian has been appointed for such individual.

(m) 'Maintenance services' means food, shelter and laundry services."  210 ILCS 40/2 (West 2002).

With this terminology in mind, we set out additional facts from the parties' life care agreement.  

When construction is complete, provider CC-Lake will offer 296 independent living units at the Glen, consisting of 251 apartments in the main building and 45 villas.  The independent living units will range in size from a 1-bedroom/1-bath apartment to a 2-bedroom/2 1/2-bath villa with a den and an attached garage.  Each unit comes with a fully equipped kitchen, smoke alarm, emergency call system, washer and dryer, and window and floor coverings.  Residents may furnish the units as they wish, within the standards described in a community handbook.  In addition to the independent living units, the Glen will also have a "care center" which will offer (a) private suites for memory support, (b) assisted living residences, and (c) private, skilled nursing suites.  Provider CC-Lake is obligated to provide long-term care at the care center, including basic skilled nursing care, assisted living and memory support, and is not obligated to provide some of the other care defined in the Life Care Facilities Act, such as "medical services," which encompasses physician care and dental care.  210 ILCS 40/2(j).  If the Glen's care center has not opened or is full, CC-Lake will pay for a resident to receive long-term care in a nearby facility.  In addition, a "Care Team" consisting of four administrative and health care professionals will "monitor care at the Community, and participate in decisions regarding care and transfer."

Individuals interested in becoming residents of the Glen and receiving long-term care from CC-Lake, however, must initially meet minimum financial and health criteria.  A material misrepresentation in a resident's application for acceptance into the community is one of the enumerated circumstances constituting "just cause" for the provider to terminate the relationship.  Depending upon which independent living unit they select, residents of the Glen pay entrance fees ranging between $255,612 and $840,000, and monthly fees ranging between $2,753 and $4,326.  The life care contract characterizes residents' entrance fees as interest-free loans to the provider, and promissory notes to that effect are issued to residents.  The contract also urges residents to seek independent tax advice but cautions them of a risk that the Internal Revenue Service may classify part or all of the entrance fees as a below-market loan to the provider and impute taxable interest to the resident.  If a second resident occupies an independent living unit at the Glen, an additional entrance fee of $25,000 and an additional monthly fee of $642 are assessed, regardless of the location or size of the unit.  But a second resident, even a spouse, must apply for admission to the community and the provider has reserved sole discretion as to whether to accept applicants into the community.  

Monthly fees, which as indicated earlier are intended to cover all the Glen's operating costs, may be adjusted upon 60 days' notice.  Some of the Glen's specified operating costs result from the provision of meals, weekly housekeeping and semi-annual window washing, weekly towel and linen service, social, cultural, and recreational activities, local group transportation, the emergency call system, space for storage and automobile parking, and routine property maintenance.  The monthly fees also cover utilities, taxes, property insurance, liability insurance, employment expenses, the costs of maintaining, repairing and replacing capital items, including furnishings, fixtures and equipment, a management fee fixed at 8% of revenues, and an annual lease payment which is initially set at $661,000 and to be adjusted every 10 years for inflation.

Monthly fees are not affected by a resident's temporary or permanent transfer from one of the Glen's independent living units to the care center.  A resident's refusal to transfer to the care center when "requested" by the provider is another example of "just cause" for ending the relationship.  The provider  is entitled to "request" a resident's transfer to another care setting at the Glen after having a "consultation" with its Care Team and the resident, or the resident's physician, or the resident's family members.  In addition, a resident may "elect to move" from one independent living unit to another available independent living unit and may "request a transfer" to a different care setting within the community.  If a resident makes what was expected to be a permanent transfer from an independent living unit to the care center but becomes able to return to residential living, the provider will offer a unit comparable to the one that was vacated, as soon as it becomes available.  After initial occupancy, a resident has the right to terminate the life care agreement for any reason, by giving at least 60 days' notice.

After agreeing to these terms in writing in December 2002, but prior to taking up residency at the Glen, plaintiff M. Lois Jackim paid an entrance fee of $366,800, plaintiffs Meyer and Gertrude Kruglik paid an entrance fee of $525,000, and plaintiff Margery Shurman paid an entrance fee of $610,000. 

The residents argue on appeal that although the life care agreement they entered into does not use the terms "lease," "rent," "landlord," "tenant," and "security deposit," this court should interpret the contract without regard to its labels in order to determine if a landlord-tenant relationship actually exists between the parties.  This court is not bound by the parties' characterization of their relationship and may disregard inaccurately applied labels or technical terms.  
Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary District of Greater Chicago
, 81 Ill. App. 3d 1005, 1009, 401 N.E.2d 1203, 1206 (1980).  Furthermore, the terms of the Security Deposit Interest Act are implied into every residential lease.  765 ILCS 715/0.01 
et seq
. (West 2002); 
Wang v. Williams
, 343 Ill. App. 3d 495, 499, 797 N.E.2d 179, 182-83 (2003).  The residents contend that since their life care agreement includes all the essential elements of a residential lease, designating the refundable portion of the facility entrance fees as an interest-free loan to the life care provider was "a charade" and that the fees are actually a "thinly disguised security deposit as defined under the [Security Deposit Interest Act]."  765 ILCS 715/0.01 
et seq 
(West 2002).  They also argue that most of the Glen's entrance and monthly fees are attributable to the use, occupancy, and enjoyment of the premises, rather than to the provision of health care, since the fees range by several hundred thousand dollars depending upon which independent living unit is occupied and only one tier of health care is offered.  They contend this pricing structure reflects that the "dominant" purpose of the parties' relationship is "the provision of upscale residential housing" and that the "secondary" purpose is the "provi[sion of] life care services."  They conclude that unless their class action complaint is reinstated on appeal, CC-Lake will be allowed to avoid its statutory interest obligation.

Section 1 of the Security Deposit Interest Act provides in relevant part:

"A lessor of residential real property, containing 25 or more units in either a single building or a complex of buildings located on contiguous parcels of real property, who receives a security deposit from a lessee to secure the payment of rent or compensation for damage to property shall pay interest to the lessee *** on any deposit held by the lessor for more than 6 months."  765 ILCS 715/1 (West 2002).  

A lessor who willfully fails to pay statutory interest is also liable for court costs and attorney fees.  765 ILCS 715/2 (West 2002).

The primary rule of statutory construction is to ascertain and give effect to the legislature's true intent and meaning.  
Kunkel v. Walton
, 179 Ill. 2d 519, 533, 689 N.E.2d 1047, 1053 (1997).  The statutory language is considered the best indication of the legislature's intent.  
Kunkel
, 179 Ill. 2d at 533, 689 N.E.2d at 1053.  "Where the meaning of an enactment is unclear from the statutory language itself, the court may look beyond the language employed and consider the purpose behind the law and the evils the law was designed to remedy."  
Kunkel
, 179 Ill. 2d at 533-34, 689 N.E.2d at 1053.  In addition, where statutory language is ambiguous, it is appropriate for the court to examine the legislative history.  
Kunkel
, 179 Ill. 2d at 534, 689 N.E.2d at 1053-54.  However, when the legislature's language is clear, it will be given effect without resort to other aids for construction.  
Kunkel
, 179 Ill. 2d at 534, 689 N.E.2d at 1054.  When the legislature's intent is clear from the plain and ordinary language of the statute, we have no authority to construe it otherwise.  
Gittleman v. Create, Inc.
, 189 Ill. App. 3d 199, 202, 545 N.E.2d 237, 239 (1989).  We are also mindful that the Security Deposit Interest Act is considered "a penal statute which must be strictly construed" and that it should not be "extended to embrace matters beyond its terms."  
Munroe v. Brower Realty & Management Co.
, 206 Ill. App. 3d 699, 704, 565 N.E.2d 32, 36 (1990).

With unqualified and unconditional wording, the interest statute directs a "lessor" of "residential real property" who receives funds from a "lessee" "to secure the payment of rent or compensation for damage to property" to pay interest on those funds to the lessee.  765 ILCS 715/1 (West 2002).  The general definition of "lessor" found in the dictionary is "a person, group, etc., who grants a lease"; and a "lessee" is "a person, group, etc., to whom a lease is granted."  Random House Webster's Unabridged Dictionary 1103 (2d ed. 1998).  A "lease" is "a contract renting land, buildings, etc., to another; a contract or instrument conveying property to another for a specified time period or for a period  determinable at the will of either lessor or lessee in consideration for rent or other compensation."  Random House Webster's Unabridged Dictionary 1095 (2d ed. 1998).  Finally, "rent" means "a payment made periodically by a tenant to a landlord in return for the use of land, a building, an apartment, an office, or other property."  Random House Webster's Unabridged Dictionary 1632 (2d ed. 1998).

After considering the parties' contractual rights and obligations in light of the clear, plain language of the interest statute, we conclude that the statute does not apply to the parties or the funds at issue in this appeal.  The defendant life care provider CC-Lake does not stand in a "lessor"/"lessee" relationship with the plaintiff residents of the Glen within the meaning of the interest statute and the entrance fees collected from the residents are not "security deposit[s]" within the meaning of the interest statute.  In fact, CC-Lake's obligations as a provider under the Life Care Facilities Act are significantly different in both character and scope from the obligations of a "lessor" of "residential real property."  765 ILCS 715/1 (West 2002).  CC-Lake has agreed to shelter the plaintiff residents for their lifetimes somewhere at the Glen, or if need be, off site at an alternate care facility.  Capable residents may chose to live in any of the available on-site independent living units within their financial means, and may relocate from unit to available unit as frequently as they wish.  Conceivably, a married couple could start their residence at the life care facility in one of the 2-bedroom/2 1/2-bath villas that includes a den and attached garage, later sell the car and downsize to one of the 2-bedroom apartments, opt for a different apartment if they tired of the unit's floor plan, view, or neighbors, and if deteriorating health forced one of the partners into one of the three types of care settings established in the Glen's on-site care-center, the other partner could relocate to an even smaller independent living unit.  CC-Lake's obligation to accommodate the fluctuating residential preferences and health care needs of the Glen's residents (with the exception of hospital care) far exceeds the duty undertaken by a "lessor" of a specific dwelling unit.  However, CC-Lake does not provide just a range of residential and health-care options;  it also "participate[s] in decisions regarding [the residents'] care and transfer" and employs a "Care Team" of administrative and health care professionals for that purpose.  CC-Lake is also obligated to provide the Glen's residents with meals, transportation, housekeeping, clean linen service, social, cultural and recreational programs, and, possibly, skilled nursing care, and daily assistance with bathing, dressing, personal grooming, and medication, and must employ a staff capable of meeting all of these obligations.  In short, CC-Lake's duties as a provider under the Life Care Facilities Act are very different in scope and character from the duties of a "lessor" of "residential real property."  We cannot construe "lessor" (765 ILCS 715/1 (West 2002)) as a synonym of a life care "provider."  210 ILCS 40/2(d) (West 2002).

Furthermore, the parties' life care agreement cannot be construed as a lease because it does not convey the right to exclusive possession of specific premises.  In 
Leonardi
, the court indicated that exclusive possession of the premises is a characteristic of a lease arrangement and that "'there must be agreement as to the extent and bounds of the property, the rental price and time and manner of payment, and the term of the lease.'"  
Leonardi
 
v. Chicago Transit Authority
, 341 Ill. App. 3d 1038, 1043, 793 N.E.2d 880, 884 (2003), quoting 
Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.
, 114 Ill. 2d 133, 145, 500 N.E.2d 1 (1986).  If we focused exclusively on the plaintiffs' current living arrangements at the Glen, in private units that in many ways resemble apartments offered to the general public, we might find their argument convincing.  As just noted above, however, the plaintiffs are contractually entitled to move from one independent living unit to another available independent living unit at the Glen, and the units are not identical in size and price, and when deteriorating health makes it impractical or impossible for the plaintiffs to continue living independently, they may be sheltered in the Glen's care center or at an alternate care facility.  The agreement does not provide for the exclusive possession of a specific unit; it provides for a range of residential settings over the remaining course of a contracting individual's lifetime, and, therefore, it is not a lease.

In effect, the plaintiff residents are asking us to isolate a few of the characteristics of the parties' relationship and a few of the terms of their contract in order to find that there is a "security deposit" for rent and property damage which is subject to the interest statute.  765 ILCS 715/1 (West 2002).  The residents, however, have not cited any authority or rule of contract construction which would allow us to disregard bargained-for terms of their contract.  We will not remake a contract in order to give a litigant "a better bargain than he himself was satisfied to make; and when the terms of a contract are clear and unambiguous, they must be enforced."  
Newcastle Properties, Inc. v. Shalowitz
, 221 Ill. App. 3d 716, 722, 582 N.E.2d 1165, 1168 (1991).  Moreover, the implicit proposal that we isolate some relationship characteristics or some contract terms in order to apply the interest statute to the plaintiff residents' facility entrance fees is not supported by any wording in the interest statute.  "There is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute imports, and a court is not at liberty to depart from the plain language of a statute by reading into it exceptions, limitations or conditions that the legislature did not express."  
Kunkel
, 179 Ill. 2d at 534, 689 N.E.2d at 1054.

 We also point out that the legislature has expressly defined a life care facility entrance fee as "an initial or deferred transfer *** of a sum of money or property *** 
which assures a resident of services 
pursuant to a life care contract."  (Emphasis added.)  210 ILCS 40/3(h) (West 2002).  We would have to disregard the legislature's express definition of the funds at issue in order to grant the residents what they are seeking, which would be improper.  
Kunkel
, 179 Ill. 2d at 534, 689 N.E.2d at 1054 (a court may not depart from the plain meaning of a statute).  The soundness of this conclusion is confirmed by the fact that the Security Deposit Interest Act was in effect for almost a decade before the Life Care Facilities Act was first enacted and yet none of the terminology in the older statute is repeated in the more recent statute.  See Pub. Act 77-705 ྷ 1, eff. January 1, 1972 (creating security deposit interest statute); Pub. Act 82-547 ྷ 1, eff. January 1, 1982 (creating life care facilities statute).  One of the rules of statutory construction is that "when the legislature uses certain words in one instance and different words in another, different results are intended."  
Hoffman v. Altamore
, 352 Ill. App. 3d 246, 256, 815 N.E.2d 984, 993 (2004).  If the Illinois legislature intended for entrance fees paid by residents to providers in connection with life care contracts to be subject to the Security Deposit Interest Act, it could have said so, either expressly or by using the terminology of the interest statute in the life care statute.  The legislature did neither. Therefore, "entrance fee" (210 ILCS 40/2(h) (West 2002)) and "security deposit" (765 ILCS 715/1 (West 2002)) cannot be construed as equivalents.  

Furthermore, when the legislature specified that an entrance fee may consist of "property" instead of "a sum of money" and that it may be given on a "deferred" basis instead of prior to the beginning of a residency, the legislature further distinguished an "entrance fee" (210 ILCS 40/2(h) (West 2002)) from the conventional "security deposit" (765 ILCS 715/1 (West 2002)) of money which is tendered to a landlord prior to the beginning of a residential tenancy.  In addition, under the contract at issue, residents are entitled to a refund of no more than 90% of their entrance fees.  The fact that the defendant provider keeps 10% of each entrance fee, and takes additional deductions for unpaid monthly fees and property damage beyond ordinary wear and tear, has not been reconciled with the statutory mandate that a "lessor *** who receives a security deposit *** to secure the payment of rent or compensation for damage to property shall pay interest to the lessee *** on any deposit held *** for more than 6 months."  765 ILCS 715/1 (West 2002).  

The plaintiff residents also emphasize that in section 15-170 of the Property Tax Code, the legislature extended a senior citizen real estate tax exemption to residents of a life care facility "irrespective of any legal, equitable, or leasehold interest in the facility."  35 ILCS 200/15-170 (West 2002).  They argue we should infer (a) that the legislature was contemplating condominium ownership of units in a life care facility, (b) that the Life Care Facilities Act (210 ILCS 40/1 
et seq
. (West 2002)) must therefore regulate only the services aspect of the parties' relationship, and (c) that the Security Deposit Interest Act (765 ILCS 715/1 
et seq
. (West 2002)) must therefore be applied to the residential aspect of their relationship.  We do not find the residents' construction of the statutes persuasive.  The clear, plain terms of the Security Deposit Interest Act (765 ILCS 715/1 
et seq
. (West 2002)) do not suggest we isolate any portion of the parties wide-ranging relationship or contractual rights and obligations in order to apply the interest statute.  We will not strain in order to find a "lessor"/"lessee" relationship or a "security deposit" where none exists.

For all these reasons, we reject the plaintiff residents' analysis of their relationship with defendant life care provider CC-Lake and conclude that the Security Deposit Interest Act (765 ILCS 715/1 
et seq
. (West 2002)) is not applicable to the entrance fees tendered pursuant to their life care agreement.

Our rejection of the residents' reasoning is supported by 
Antler v. Classic Residence Management Limited Partnership
, 315 Ill. App. 3d 259, 266, 733 N.E.2d 393, 398-99 (2000), in which this court analyzed the issue of whether a life care provider and a life care facility resident are to be treated as "landlord" and "tenant" for purposes of a local counterpart to the state statute at issue, the Chicago Residential Landlord Tenant Ordinance (RLTO) (Chicago Municipal Code ྷྷ 5-12-080, 5-12-170 (1998).  The plaintiff in 
Antler
 paid an "entrance fee" to reside in an Illinois life care facility called the Hallmark and marketed as "'a residential community for active seniors of 62 years or older located along the Chicago lakefront.'"  
Antler
,  315 Ill. App. 3d at 260, 733 N.E.2d at 394.  Like the entrance fees at issue, 90% of the Hallmark's entrance fee was refundable at the end of a residency.  
Antler
, 315 Ill. App. 3d at 262, 733 N.E.2d at 396.  The plaintiff also alleged and argued that the life care provider she contracted with was a "landlord," that she was a "resident" (
Antler
, 315 Ill. App. 3d at 264, 733 N.E.2d at 397), and that the tendered entrance fee was actually "a disguised security deposit" subject to the interest provision of Chicago ordinance.  
Antler
, 315 Ill. App. 3d at 262, 733 N.E.2d at 396.  The court rejected her claim and in doing so distinguished a landlord-tenant relationship from a life care facility provider-resident relationship:

"We consider the Hallmark's status as a life care facility to be a significant factor differentiating the relationship it maintains with its residents from a basic landlord/ tenant relationship.  Defendants, as providers under the Life Care Facilities Act, have reposed in them special responsibilities toward their residents that differ in nature and in scope from those existent in the common landlord/tenant relationship. ***

Moreover, a comparison of the relationships created between parties to a landlord/tenant relationship as contemplated by the definitions in the RLTO, and a provider/resident relationship, as contemplated by the definitions in the Life Care Facilities Act, reveals that different treatment under the law is appropriate."  
Antler
, 315 Ill. App. 3d at 266, 733 N.E.2d at 398-99.

The plaintiff residents of the Glen contend 
Antler
 should be disregarded here because the court was resolving whether the Hallmark qualified as an "extended care facility," which was one of several types of " '[h]ousing accommodations' " expressly exempted from the Chicago landlord/tenant ordinance.  
Antler
, 315 Ill. App. 3d at 264, 733 N.E.2d at 398, quoting Chicago Municipal Code ྷ5-12-020(c) (1998).  They point out that there is no corresponding exception for extended care facilities in the Security Deposit Interest Act and conclude that CC-Lake should not "gain the benefit of [an exception to] the Chicago [ordinance] while it operates in Glenview."  We do not find this distinction persuasive, however, because the reason for the court's analysis does not change the fact that the court engaged in the analysis.  
Antler
 supports our findings that the relationship at issue is not a landlord/tenant relationship and should not be treated as such for the purposes of the Illinois interest statute.

Furthermore, other jurisdictions have similarly concluded that a life care agreement is not a lease or that a life care provider and resident do not have a landlord and tenant relationship.  For instance, in 
American National Bank & Trust of New Jersey v. Presbyterian Homes of New Jersey
, 148 N.J. Super. 465, 372 A.2d 1147 (1977), a New Jersey court was asked to determine whether a particular "residence agreement or life-care contract" amounted to the sale or lease of a unit in a retirement community and would be subject to the jurisdiction's retirement community full disclosure statute.  Like the Glen, the New Jersey retirement community provided "many services *** which are not present in a landlord-tenant relationship -- e.g., medical care, maid service, linen and towel service, and meal service consisting of three meals a day in a common dining hall," and the provider had the discretion to send the resident to the hospital if she became ill and then reassign her to a comparable unit upon her discharge from the hospital.  
American National Bank
, 148  N.J. Super. at 470-71, 372 A.2d at 1150.  The court pointed out that the residence agreement did not include terms that normally would be found in a lease and that, instead of being for a definite duration, the relationship was intended to continue until death and either party could terminate the arrangement at will.  
American National Bank
, 148 N.J. Super. at 473, 372 A.2d at 1151-52.  "Thus, the arrangement has the characteristics of a license or similar limited status -- not a lease."  
American National Bank
, 148 N.J. Super. at 473, 372 A.2d at 1152.  In addition, no property rights would flow to the resident's estate upon her death, such as the right to possess the unit or receive the services provided at the community.  
American National Bank
, 148 N.J. Super. at 473, 372 A.2d at 1152.  In fact, no person other than the contracting resident was authorized to occupy the unit covered by the agreement, except with the approval of the provider. 
American National Bank
, 148 N.J. Super. at 474, 372 A.2d at 1152.  All of the characteristics noted by the New Jersey court can be found in the residence agreement now at issue, and it was these characteristics which led the court to conclude, "A reading of the residence agreement in its entirety dispels any conception of a leasehold interest."  
American National Bank
, 148 N.J. Super. at 474, 372 A.2d at 1152.  The court reached this conclusion even though several marketing brochures referred to the living accommodations as "apartments" and indicated a "capital fee" paid upon entrance into the community was "the consideration for a life-time lease on the specified apartment."  
American National Bank
, 148 N.J. Super. at 472, 372 A.2d at 1151.

We also find another New Jersey opinion, 
Starns v. American Baptist Estates of Red Bank
, 352 N.J. Super. 327, 800 A.2d 182 (2002), to be instructive.  In 
Starns
, the court remarked that although independent living units in a continuing care retirement facility "most resemble apartments in a multi-family building *** there are notable differences" and that such a facility "provides more for each resident than a place to live."  
Starns
, 352 N.J. Super. at 337, 800 A.2d at 188 (2002).  Some of the special amenities which made the New Jersey facility more than a place to live included emergency call service, on-site health services, and medical services.  
Starns
, 352 N.J. Super. at 337, 800 A.2nd at 188.  Other distinguishing characteristics noted by the court were that a tenant of "an open market residential unit need not qualify medically to begin their tenancy or to purchase their unit, and will not be moved from unit to unit as their health status changes, and does not need to qualify their spouse if they should marry after commencement of their tenancy."  
Starns
, 352 N. J. Super. at 337, 800 A.2d at 188.  The court also pointed out that "[o]nce a resident moves from an independent living unit to a living unit which offers more personal services and health care, the resemblance to an open market residential unit is more strained."  
Starns
, 352 N.J. Super. at 337, 800 A.2d at 188.  "Finally, once a resident enters a nursing unit or requires skilled nursing services, the resemblance to an open market residential unit is non-existent."  
Starns
, 352 N.J. Super. at 337, 800 A.2d at 188.  Given these facts, the court concluded there was "a substantial difference" between a continuing care retirement community and a "residential unit in a residential building."  
Starns
, 352 N.J. Super. at 337, 800 A.2d at 188.

Similarly, a New Mexico court declined to find it unconscionable for an Albuquerque "life care retirement center" to collect non-refundable entrance fees, in part because "the services and contractual obligations of [the life care provider] are not comparable to those provided by landlords of apartments."  
Guthmann v. La Vida Llena
, 103 N.M. 506, 512-13, 709 P.2d 675, 681-82 (1985).  Many of the obligations and services noted in the New Mexico opinion are also found in the current parties' residency agreement.  For example, the New Mexico resident contracted for a one-bedroom unit with a fully equipped kitchen for the rest of her life and guaranteed admittance to the facility's care center.  
Guthmann
, 103 N.M. at 508, 709 P.2d at 677.  In addition to an entrance fee, she was required to pay monthly service fees "to cover such things as a daily meal, tray service when needed, building and grounds maintenance, laundry service, transportation services, utilities, basic or skilled nursing, special medical diets, planned activities, bi-weekly cleaning of the unit, parking, use of common areas, etc."  
Guthmann
, 103 N.M. at 508, 709 P.2d at 677.  Also, there was no time limit on use of the care center; however, if the resident was confined there permanently or for an extended period, the defendant had the right to reassign her unit and could offer her a similar unit should she recover sufficiently to resume independent living.  
Guthmann
, 103 N.M. at 508, 709 P.2d at 677.  The trial judge whose ruling was affirmed on appeal found that  "[t]he services provided by and contractual obligations of [the defendant] to residents, especially as to health care, are substantially different in kind and quality from those provided by landlords of apartments[,] and comparisons are not valid."  
Guthmann
, 103 N.M. at 572, 709 P.2d at 681.

 Thus, each of these courts considered the full scope of the parties' relationship before deciding whether it was dealing with an ordinary tenancy or a life care arrangement.  We also note that none of the courts used the analytical approach the plaintiffs are relying upon of estimating the relative costs of the real property and all other benefits conveyed in order to infer the purpose of the parties' relationship. 

The plaintiff residents of the Glen contend we should disregard the weight of this out-of-state authority, because none of the courts was addressing the same factual circumstances, this state's life care facilities statute, this state's security deposit interest statute, or their own state's security deposit interest statute.  None of the narrow distinctions the plaintiffs draw, however, detract from the fact that numerous courts have considered and rejected the premise of the plaintiffs' complaint.

The exception to these cases is one that the residents cite, 
Markham v. John Knox Village of Florida, Inc.
, 547 So. 2d 1044, 1046 (Fla. App. 1989).  In 
Markham
, the court found that a continuing care agreement with a Florida retirement village was "a form of long-term rental contract" entitling residents to a senior citizen property tax exemption.  
Markham
, 547 So.2d at 1046.  The court reached this conclusion even though there was contract language indicating the agreement was not "a lease" and did not create any interest in real property.  
Markham
, 547 So. at 1045.  The court indicated it found this contract provision perplexing, since the residents were required to put up a deposit and intended to make the units their permanent homes.  
Markham
, 527 So.2d at 1045-46.  Exactly why the court found these particular circumstances dispositive indications of a "lease" is not made clear in the opinion.  The court did not cite any authority supporting its reasoning, and there is no indication in its opinion that the court considered the full range of benefits made available to residents before it characterized their continuing care agreement as a lease.  Therefore, we do not find 
Markham
 particularly persuasive or relevant to the facts at issue on appeal.

Instead, we conclude that the clear, plain language of the Security Deposit Interest Act indicates it is not applicable to the entrance fees collected from the plaintiff residents of the Glen, because they each entered into a life care agreement with the defendant life care provider CC-Lake, rather than a lease.  After examining the life care contract in its entirety, we cannot conclude that it created a traditional landlord/tenant relationship.  It is the legislature's role to extend the scope of the Security Deposit Interest Act to agreements such as the Glen's residence agreement if it sees fit to do so.  Accordingly, we find the plaintiff residents did not and could not state facts sufficient to bring a claim under the statute they relied upon, and affirm the circuit court's dismissal of their class action complaint.

Affirmed.

GORDON and BURKE, JJ., concur.

FOOTNOTES
1:  References to CC-Lake include affiliated corporations that are involved in the ownership, operation, and management of the Glen.