FOURTH DIVISION

June 30, 2000

 No. 1-99-1486

LUCILLE ANTLER, )

Plaintiff-Appellant, )

)

)

) 

) Appeal from the

CLASSIC RESIDENCE MANAGEMENT LIMITED ) Circuit Court of

PARTNERSHIP; THE FIRST NATIONAL BANK ) Cook County.

OF CHICAGO, as Trustee of the Living )

Environments For an Aging America )

Fund; CLASSIC RESIDENCE MANAGEMENT, ) 

INC.; 2960 MANAGEMENT, L.P.; PRIME )

SENIOR SERVICES, INC.; K/2960 ) No. 98 CH 6528

LIMITED PARTNERSHIP; THE PRIME GROUP, )

INC.; KILICO REALTY CORPORATION; )

CHICAGO TITLE and TRUST COMPANY, )

as Trustee Under Trust 1084719; ) Honorable 

HALLMARK PARTNERS,L.P.; PRIME HALLMARK, ) John K. Madden,

INC.; HEALTH AND RETIREMENT PROPERTIES ) Judge Presiding.

TRUST; AND BLC PROPERTY, INC., )

Defendants-Appellees. )

   

JUSTICE BARTH delivered the opinion of the court:

Lucille Antler (Antler), the named plaintiff in the underlying class action lawsuit, filed a complaint against the named defendants, who collectively own, operate and manage an apartment building for independent seniors in which Antler resided (the Hallmark).  The complaint alleged that defendants violated the Chicago Residential Landlord Tenant Ordinance (RLTO) (Chicago Municipal Code §§ 5-12-080, 5-12-170 (1998))  and the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), (815 ILCS 505/1 
et
 
seq
. (West 1998)), by failing to attach summaries of the to Antler's residency agreements, and by failing to pay her hundreds of dollars in interest on her building entrance fee.  Defendants moved to dismiss pursuant to sections 2-615 and 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619(a)(9) (West 1998)), on the grounds that the Hallmark is an "extended care facility," explicitly exempt from compliance with the RLTO.  The trial court granted defendants' motion to dismiss pursuant to section 2-619 with prejudice.  From that order, Antler now appeals, and we affirm.

BACKGROUND

Antler is an elderly woman who resided at the Hallmark from October 1990 until April 1998 pursuant to three agreements.  The agreements describe the 340-unit Hallmark apartment building as "a residential community for active seniors of 62 years or older located along the Chicago lakefront."

Prior to opening the Hallmark, defendants (specifically, the Living Environments for an Aging America Fund or LEAAF)

applied to the Department of Public Health for a permit under the Life Care Facilities Act, (210 ILCS 40/1 
et
 
seq
. (West 1998)), to authorize them to enter into life care contracts.  The Life Care Facilities Act defines a "life care contract" as:

"[A] contract to provide to a person for the

duration of such person's life or for a term

in excess of one year, nursing services, 

medical services or personal care services,

in addition to maintenance services for such

person in a facility, conditioned upon the

transfer of an entrance fee to the provider of 

such services in addition to or in lieu of

the payment of regular periodic charges for

the care and services involved."  210 ILCS 

40/2(c) (West 1998).

In conjunction with their application, defendants were required to submit extensive documentation, including a sample of the life care contract into which Hallmark residents like Antler would enter, to the Department of Public Health.  They also submitted proof of financial status and evidence of compliance with the Life Care Facilities Act's  escrow requirements for newly opening life care facilities.  See 210 ILCS 40/3 through 7 (West 1998).  On the basis of the foregoing documentation, the Department of Public Health issued defendants a permit to operate as a life care facility and to enter into life care contracts.

Plaintiff entered into her first life care contract at age 82 in October 1990, when the Hallmark first opened.  At that time, the Hallmark was owned by the First National Bank of Chicago, as trustee for LEAAF.  Classic Residence Management Limited Partnership (Classic, L.P.), the manager of the Hallmark, executed the first residency agreement on LEAAF's behalf.  Contemporaneously with the execution of the first residency agreement, Antler paid an entrance fee of $29,200.  Of that amount, the residency agreement required LEAAF to deposit $10,000 into a "Health Care Fund" escrow account, to be used for the payment of Antler's long-term health care.  In addition to providing for long-term health care insurance, LEAAF contracted with St. Joseph's (the hospital adjacent to the Hallmark) to operate a wellness center on the Hallmark's premises.  Also, the residency agreement provided Antler with priority admission to St. Joseph's nursing facility, should it be required, either on a temporary or a permanent basis.  If no beds were available at St. Joseph's or another facility were preferred, assistance with transfer would be provided.  

The remaining balance of Antler's entrance fee, $19,200, was placed in an escrow account and, beginning in the fourteenth month after occupancy, was to be used as "additional consideration" to pay for the basic services provided at the Hallmark.
(footnote: 1)  These basic services (more were available for an additional fee) included:

"(i)   
Dining Service
: continental breakfast each day, plus 25 meals per month per resident from [our] selective menus.  Meals may be used for [your] guests Sunday through Thursday.

 

(ii)  
Unit Housekeeping Service
: once every week, including vacuuming, dusting and light cleaning.

(iii) 
Linen Service
: once every week, including pick-up, laundering and return of bed linens.

(iv)  
Scheduled Transportation Service
: scheduled transportation service provided to and from area shopping centers, banks, health care facilities and selected special events.

(v)   
In-Unit Emergency Response System
: emergency call system in bedroom and bathroom, monitored 24 hours per day by [our] staff."

In October 1991, LEAAF and Antler entered into a revised (or second) residency agreement.  This agreement, which was for a two-year term, provided as a condition to residency that Antler pay LEAAF a $19,200 entrance fee, which was the balance remaining on the original $29,200 entrance fee after accounting for the $10,000 set aside for the Health Care Fund.  The provisions of the second agreement were substantially the same as those of the first, except that the second provided that the entrance fee was 90% refundable to Antler upon either her death or the expiration of the residency agreement. 

In August 1992, LEAAF assigned its interest in the Hallmark to one of the other defendants, K/2960 Limited Partnership, and the Prime Group, Inc., began acting as the owner's agent/manager of the building.  

Antler subsequently entered into a third residency agreement, with a commencement date of January 1993.  Upon execution of that agreement, 90% of the $19,200 fee paid pursuant to (and made refundable by) the second agreement was returned to Antler, minus $2,500 retained as the entrance fee charged pursuant to the third agreement ($14,780 total).  No interest was paid to Antler at that time.  Also, it was agreed that Antler would be responsible for her 
pro
 
rata
 share of the Hallmark's real estate taxes, which the Hallmark would deduct from her monthly service fee.

Antler terminated the third residency agreement in April  1998.  At that time, the $2,500 entrance fee was returned to her.  She demanded interest, but her demand was refused.

                       A.  The Complaint

Antler filed the complaint in the instant lawsuit in May 1998.  The complaint alleged that the $19,200 portion of the entrance fee under the first and second residency agreements, and the $2,500 entrance fee under the third residency agreement all qualify as "security deposits" within the meaning of section 5-

12-080 of the RLTO.  The complaint further alleged that Antler is a "tenant" within the meaning of the RLTO.  According to Antler, defendants violated the RLTO by: (a) refusing to pay annual interest to her on the security deposit portion of her entrance fee, as required by section 5-12-080; and (b) failing to attach a copy or summary of the RLTO to the residency agreements, as required by section 5-12-170.  The complaint sought interest and penalties resulting from such violations, along with a prayer for punitive damages.

Antler also alleged that because the entrance fee was, in fact, a disguised security deposit, defendants deliberately concealed from her her rights under the RLTO, in violation of the Consumer Fraud Act.  

                 B.  Summary of Motions to Dismiss 

Each of the defendants filed motions to dismiss in which they asserted various arguments under sections 2-615 and 2-619 of the Code of Civil Procedure.  The asserted bases for dismissal were essentially fourfold.  First, defendants argued that the RLTO is not applicable to Antler's entrance fee under the residency agreement.  Collectively, they contended: (a) that the Hallmark is exempt from the requirements of the RLTO because it is an "extended care facility" within the meaning of RLTO section 5-12-020(c); and (b) that the Hallmark's residency agreement is not a "rental agreement" requiring a "security deposit" within the meaning of RLTO section 5-12-030, but, rather, is a "life care contract" requiring an "entrance fee" under the Life Care Facilities Act, and that, to the extent there is a conflict, the Life Care Facilities Act prevails.  

Second, defendants Classic, L.P., and Prime argued that they are agents for disclosed principals (
i.e.
, the owners of the Hallmark) who are, therefore, not liable for the acts or omissions of the principals.  Also, Prime contended that it has never owned the Hallmark and is, therefore, not a "landlord" subject to the RLTO.

Third, defendants argued that Antler fails to state a cause of action under the Consumer Fraud Act because that claim is derivative of, and dependent upon, her defective RLTO claim.  At the very least, they argued (in the section 2-615 motion), there is no basis for punitive damages, since no aggravating circumstances are alleged.

Fourth, defendants argued that Antler's claims are time-

barred by the two-year statute of limitations applicable to RLTO and by the three-year statute of limitations applicable to the Consumer Fraud Act.

                    C.  Dismissal With Prejudice

On January 8, 1999, the trial court entered an order dismissing Antler's complaint with prejudice.  The court stated in its order (simply) that "Defendants' Motions to Dismiss Plaintiff's Class Action Complaint pursuant to 735 ILCS 5/2-619 are granted with prejudice."  

Antler filed a motion to reconsider on January 21, 1999.  That motion was denied on March 26, 1999, after which Antler timely filed her notice of appeal.

  ANALYSIS 

Our review of the trial court's order granting dismissal pursuant to section 2-619 of the Code of Civil Procedure involves a pure question of law and is therefore 
de
 
novo
.  
Kedzie & 103rd
 
Currency Exchange v. Hodge
, 156 Ill. 2d 112, 116, 619 N.E.2d 732 (1993).   Section 2-619(a)(9) permits dismissal of an action where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim."  735 ILCS 5/2-619(a)(9) (West 1998).  An "affirmative matter" is something in the nature of a defense that completely negates the cause of action or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint.  
Malanowski v. Jabamoni
, 293 Ill. App. 3d 720, 723, 688 N.E.2d 732 (1997).

   I. Hallmark's Status Under the RLTO   

     Antler's lawsuit is based on the premise that the RLTO governs the actions of the defendants, since they are "landlords" as defined by that ordinance, she is a "tenant" thereunder, and the contract she signed when she took up residence in the Hallmark was a "rental agreement."  Therefore, according to Antler, defendants violated sections 5-12-080(a), (c), and (d) of the RLTO, when they failed to place her security deposit (the payment she made up front to defendants) in an interest-bearing account, and to return that interest to her after the end of each 12-month period of her tenancy.  Defendants respond that they are exempt from compliance with the RLTO by the very terms of that ordinance, since the Hallmark is an "extended care facility" under section 5-12-020(c).   Moreover, defendants assert, the Hallmark is a life care facility, operating under a permit issued pursuant to the Life Care Facilities Act, and the city council, in drafting the RLTO, intended that the phrase "extended care facility" exempt entities such as life care facilities. 

     Section 5-12-020(c) of the RLTO provides:

"Rental of the following dwelling units

shall not be governed by this chapter 

unless the rental agreement thereof is created

to avoid the application of this chapter:

 ***

(c) Housing accommodations in any

hospital, convent, monastery, 
extended
 

care facility
, asylum, or not-for-profit

home for the aged, temporary overnight

shelter, transitional shelter, or in a

dormitory owned and operated by an

elementary school, high school or 

institution of higher learning ***."

(Emphasis added.) Chicago Municipal Code 

§ 5-12-020(c) (1998). 

The instant dispute thus centers around the definition of "extended care facility," and the question whether, as a matter of law (
Zedella v. Gibson
, 165 Ill. 2d 181, 185, 650 N.E.2d 1000 (1995)), the Hallmark qualifies as such a facility.  We hold that it does. 

A court's primary function in interpreting a statute is to give effect to the intent of the legislature in enacting the statute. 
Metro Utility Company v. Illinois Commerce Commission et al.
, 262 Ill. App. 3d 266, 273-74, 634 N.E.2d 377 (1994).  In construing a municipal ordinance, courts should give effect to the intention of the municipality as it is evidenced by the ordinance's terminology, its goals and purposes, the structure of the ordinance, the setting in which the words are used, and the common and accepted usage of the words.  
McArdle v. Rodriguez
, 277 Ill. App. 3d 365, 373, 659 N.E.2d 1356 (1995). 

We begin with the observation that the phrase "extended care facility" does not have a common and accepted usage, nor is that term defined in either the RLTO or the greater Chicago Municipal Code.  Antler urges this court to look to the apparently similar phrase, "long term care facility," which the Municipal Code defines by borrowing the definition contained in the Nursing Home Care Act (210 ILCS 45/1 
et
 
seq
. (West 1998)).  Chicago Municipal Code § 4-96-010 (1998)
.  We find the definition of "long term care facility" contained in the Nursing Home Care Act instructive.  See 
In re B.C.
, 176 Ill. 2d 536, 542-43, 680 N.E.2d 1355 (1997) (where the language of a statutory provision is not clear, a court may resort to other aids for construction).  That definition provides, in relevant part, that a "long term care facility" is:

"[A] private home, institution, building,

residence, or any other place, whether

operated for profit or not, *** which

provides, through its ownership or 

management, personal care, sheltered 

care or nursing care for 3 or more 

persons, not related to the applicant

or owner by blood or marriage."

210 ILCS 45/1-113 (West 1998). 

"Personal care" is defined as:

"[A]ssistance with meals, dressing,

movement, bathing or other personal

needs or maintenance, or general 

supervision and oversight of the 

physical and mental well-being of

an individual, who is incapable of *** 

managing his person." 210 ILCS

45/1-120 (West 1998).

"Sheltered care" is defined as:

"[M]aintenance and personal care."  

210 ILCS 45/1-124 (West 1998).

We note, as Antler points out, that the Hallmark does not itself provide residents with the various types of high-level, skilled nursing care that someone who was truly incapable of caring for himself or herself would require.  Accordingly, Antler insists, the Hallmark is nothing more than a "luxury high-rise" for senior citizens, and defendants are nothing more than landlords, subject to the RLTO's requirement that interest on security deposits be returned to the tenant.  We do not agree that Antler's premise necessarily leads to her conclusion. 

We consider the Hallmark's status as a life care facility to be a significant factor differentiating the relationship it maintains with its residents from a basic landlord/tenant relationship.  Defendants, as providers under the Life Care Facilities Act, have reposed in them special responsibilities toward their residents that differ in nature and in scope from those existent in the common landlord/tenant relationship.  For example, although the Life Care Facilities Act does not require its permittees to provide high-level, specialized care themselves, they must, at a minimum, contract with third parties to ensure that such care is available.
  Specifically, the Department of Public Health requires:

"If the life care facility contains no

licensed long-term care beds, a written

explanation of plans to meet the eventual

needs of those residents who require 

contractually entitled levels of care,

beyond maintenance services in living

units, must be provided to the Department

at the time of the application."  

77 Ill. Adm. Code §396.30(b)(5)(B) (1998).

Moreover, a comparison of the relationships created between parties to a landlord/tenant relationship as contemplated by the definitions in the RLTO, and a provider/resident relationship, as contemplated by the definitions in the Life Care Facilities Act, reveals that different treatment under the law is appropriate. 

The RLTO defines "landlord" quite broadly as "the owner, agent, lessor or sublessor, or successor in interest of any of them, of a dwelling unit or the building of which it is part."  Chicago Municipal Code § 5-12-030(b) (1998).  A "tenant" is defined as "a person entitled by written or oral agreement *** to occupy a dwelling unit to the exclusion of others."  Chicago Municipal Code § 5-12-020(h) (1998).  In contrast to the broad, inclusive definitions of the RLTO, the Life Care Facilities Act defines the relationship between providers and residents much more narrowly.  A "provider" under the Life Care Facilities Act is "a person who provides services pursuant to a life care contract."  210 ILCS 40/2(d) (West 1998).  A "resident" is "a person who enters into a life care contract with a provider, or who is designated in a life care contract to be a person provided with maintenance and nursing, medical or personal care services."  210 ILCS 40/2(e) (West 1998).  

We conclude that by exempting the category of dwellings known as "extended care facilities," the Chicago city council acknowledged that certain groups of individuals, such as senior citizens, may seek or require more specialized living arrangements than are contemplated by the landlord/tenant relationship created in the ordinary lease agreement.  Concomitantly, the state has statutorily created life care facilities, wherein senior citizens may receive certain services that they are no longer willing or able to provide for themselves, such as assistance with transportation, laundry, and  meals.  Life care facilities reasonably can, in our judgment, be construed as included under the "extended care facilities" rubric ordained by the city council. 

We further observe that the services available to Hallmark residents comport in important respects with the very definition of "extended care facility" that Antler urges this court adopt, buttressing in our view the conclusion that the owners and operators of the Hallmark are not subject to the RLTO.  
 

For example, in support of their motion to dismiss, the Prime defendants submitted the affidavit of Mark Schulte, executive officer of Brookdale Living Communities of Illinois (Brookdale).  Schulte supervises the senior independent and assisted living operations conducted at various facilities throughout the United States, one of which is the Hallmark.  Contained in the Schulte affidavit is the averment that the Hallmark offers a full range of "life-time" services to Hallmark residents, including (as contained in the Resident Manual), access to the "Center For Healthy Aging," a facility run by St. Joseph's Hospital but located in the Hallmark building, where residents can visit a full-time nurse and physicians who keep office hours, receive blood pressure and weight screening, and attend lectures or health-related special events.

     Also, for those Hallmark residents who need additional assistance with day-to-day activities, the Hallmark offers medication reminder services, bathing assistance, escort and errand service, grocery shopping service, and other like assistance.  These special services are in addition to the laundry, meal, housekeeping, scheduled transportation, and in-

unit emergency response services automatically available to Hallmark residents.  

Antler did not file an affidavit in opposition to that of Schulte.  When facts alleged in an affidavit are not contradicted, those facts are taken as true for purposes of a section 2-619 motion.  
Barber-Colman Co. v. A & K Midwest Insulation Co.
, 236 Ill. App. 3d 1065, 1078, 603 N.E.2d 1215 (1992).  The Schulte affidavit's listing of services provided by the Hallmark to its residents incorporated therein by reference to the Resident Manual, provides a sufficient basis for our conclusion that defendants do not enter into simple landlord/tenant relationships with residents but, rather, into provider/resident relationships which harmonize with the city council's legislative design regarding exclusion of extended care facilities.  We therefore hold that the Hallmark is an extended care facility.  And, consequently, is exempt from compliance with the RLTO by the terms of section 5-12-020(c).  

     Antler has strongly urged this court to adopt the holding in 
M&I First National Bank v. Episcopal Homes Management, Inc.
, 195 Wis. 2d 485, 536 N.W.2d 175 (1995), a case in which the Wisconsin Court of Appeals held that certain "residency agreements" signed by the residents of a facility for the elderly were, in essence, rental agreements, and the "entrance fees" paid by those same residents were, in essence, "security deposits," and that to allow the labels used by the parties to control would be to elevate form over substance, in derogation of public policy.      While we recognize that both 
M&I
 and the present case involve the characterization of funds advanced to facilities for the elderly by the residents of those facilities, we find that the similarities end there.

   
  In 
M&I
, the Wisconsin Court of Appeals was called upon to decide who, among competing claimants (the trustee for bond holders or the residents), had priority to a fund holding entrance fees paid by residents of a bankrupt facility for the elderly.  The Wisconsin Administrative Code (Code) requires that all "security deposits" in dwellings subject thereto be returned to the residents.  The relevant exemption clause applied only to those institutions that offered dwelling units "incidental to the provision of medical, geriatric, educational, counseling, religious or similar services."  
M&I
, 195 Wis. 2d at 503, 536 N.W.2d at 184-85.  In order to determine who had the superior claim to the fund, the court in 
M&I
 had to determine whether the facility's furnishing of lodging to the residents was "merely incidental" to its provision of 
geriatric or religious services.  Based on the limited services provided by the facility, and the fact that the residents were "on their own" (no arrangements were made for their care) once they could no longer live independently, the court concluded that the primary purpose of the facility was to provide a residence for the elderly.  Thus, the facility was not exempted from the operation of the Code's requirement that security deposits be returned to the residents.  The court in 
M&I
 emphasized that labeling the up-front payments as "entrance fees" was not controlling and that it was the nature of the agreements, and the relationships they created, that determined whether facilities were subject to the Code.

 
   First, we note that the exemption clause at issue in 
M&I
 bears no resemblance to that contained in the RLTO.  Under the Wisconsin statute, to be exempt, the facility's main purpose would have to be the provision of treatment of diseases for the aged.  If it was not, then the facility was subject to the statute.
(footnote: 2)
     In contrast, our task is to determine whether the Hallmark is an "extended care facility" within the meaning of the RLTO.  As a facility operating pursuant to a permit issued under the Life Care Facilities Act, the Hallmark, by statutory definition, offers its residents personal care and assisted living services.  Furthermore, as permitted under the Life Care Facilities Act, where the Hallmark itself is unable to meet a resident's care requirements, the providers have made arrangements with other facilities to ensure that such care is ultimately available.

Thus, while 
M&I
 may represent a sound application of Wisconsin law to the facts of that case, we find it inapposite to 

the case 
sub
 
judice
.

    
 
 
      II. The Consumer Fraud Claim
 

In the light of our determination that Antler cannot state a cause of action against defendants under the RLTO, we now consider the viability of her claim under the Consumer Fraud Act.  Defendants argue that this claim is derivative of her RLTO claim(s), and we agree.  Antler's Consumer Fraud Act claim is premised on the theory that when defendants failed to attach a summary of the RLTO to Antler's residency agreement, they did so with the intent to deceive or defraud Antler with respect to her rights thereunder.  Since we conclude that defendants are not subject to the RLTO, but are exempt from compliance with that ordinance, we necessarily conclude that Antler's Consumer Fraud Act claim, derivative of her RLTO claim, fails.

Because of our disposition of the above issues, we need not reach the remaining arguments raised by defendants below, and addressed here by Antler.

Finally, we note that the Chicago city council may amend the RLTO if it determines in light of our decision that facilities such as the Hallmark were not contemplated for exclusion when the phrase "extended care facility" was written into that ordinance.  However, for the reasons set forth above, we decline to infer the inclusion of life care facilities under the purview of the RLTO as it is written.  

 CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court granting the defendants' motion to dismiss Antler's complaint pursuant to section 2-619.  

Affirmed.

HOFFMAN, P.J., and SOUTH, J., concur.

FOOTNOTES
1:  This money was refundable upon termination of the agreement, subject to the following: (a) a deduction of a monthly fee calculated from the inception of the tenancy to the date of termination; and (b) a deduction of all late payments due under the agreement along with "the expense of repairing property damage caused by [the resident] other than that due to normal wear and tear."

2:  We observe that, in reaching its conclusion, the court in 
M&I
 specifically noted that the facility being considered did not (1) market itself as a nursing home or life care facility, (2) offer specialized services other than a wellness nurse and other "incidental" amenities, and (3) enter into life care contracts.  
M&I
, 195 Wis. 2d at 505, 536 N.W.2d at 185 n.12.