2021 IL App (1st) 191858

SIXTH DIVISION
Filing Date April 23, 2021

No. 1-19-1858

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| MICHELLE WOLFF, as Executor of the ESTATE OF MARJORIE HAMILTON, individually and as the representative of a class of similarly situated persons, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | No. 14 CH 003433 |
| v. | ) ) ) | The Honorable Michael T. Mullen, |
| BETHANY NORTH SUBURBAN GROUP, d/b/a CHESTNUT SQUARE AT THE GLEN ASSOCIATION, | ) ) ) | Judge, Presiding. |
| Defendant-Appellee. | ) | |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mikva & Justice Harris concurred in the judgment,
and opinion.

**OPINION**

¶ 1        Plaintiff  Michelle Wolff, as Executor of the Estate of Marjorie Hamilton, individually and

as the representative of a class of similarly situated persons, appeals from an order of the circuit

court of Cook County that granted summary judgment in favor of defendant, Bethany North

Suburban Group d/b/a Chestnut Square at The Glen Association (Bethany) and denied

plaintiff's partial motion for summary judgment. Plaintiff, as representative of a class of similarly situated persons, sought damages from Bethany for violations of the Security Deposit Interest Act (Interest Act) (765 ILCS 710/1 *et seq.* (West 2014)) and the Security Deposit Return Act (Deposit Return Act) (765 ILCS 715/1 *et seq.* (West 2014)). Plaintiff also sought individual damages for consumer fraud under the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)) and breach of contract.

¶ 2    Plaintiff raises the following issues on appeal: (1) whether the circuit court erred in granting Bethany's motion for summary judgment on both the class claims and her individual claims, and (2) whether the circuit court erred in denying her motion for partial summary judgment on the class claims.  For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    BACKGROUND

¶ 4                              A. Factual Background

¶ 5    Marjorie Hamilton (Hamilton) entered into a contract titled "Residency and Services Agreement" (Agreement) Chestnut Square at The Glen Association (Chestnut Square) for Apartment 1309A on December 1, 2004. In the definitions section of the Agreement, Chestnut Square was defined as an Illinois not for profit corporation that operates an independent living senior housing community for persons 55 years and older[1] in Glenview, Illinois, and is affiliated with Bethany Methodist Corporation. The Agreement provided for an initial deposit that was to be paid by Hamilton to reserve a residence in Chestnut Square that would only be refunded as expressly provided in the Agreement. The Agreement further stated that Chestnut Square would pay interest on the initial deposit at the passbook savings rate established by

---

[1] Bethany describes Chestnut Square as a "continuing care retirement community."

Bank One. The entrance fee, which is the fee at issue, was defined as "the fee charged by Chestnut Square Association upon your taking possession of your residence ("the Apartment")."

¶ 6 The Agreement was divided into several sections; those that are relevant to the controversy at hand are as follows. Section II, Admission & Occupancy, contained the following key provisions: (1) the Agreement was conditioned on Chestnut Square securing all necessary financing, permits, licenses and government approvals required for the construction of the property within five years; (2) if such financing, permits, licenses and government approvals were not received within five years and upon notice from Chestnut of same, either party could elect to terminate the Agreement within 90 days after the expiration of the five-year period or the notice is sent, and the initial deposit would be refunded with the interest earned; (3) Hamilton could elect to terminate the Agreement at any time prior to occupancy of the apartment and receive a refund of her initial deposit without interest, when another Agreement for the apartment had been signed and the initial deposit received; (4) failure to take occupancy within 60 days of the occupancy date could result in the apartment being reassigned and the Agreement terminated; the initial deposit would be refunded without interest, at the time the apartment became occupied by another resident and a new entrance fee received; and (5) Hamilton had the right to reside at Chestnut Square under the terms of the Agreement and to receive services during the balance of her lifetime or until the Agreement was terminated as provided in Section VIII.

¶ 7 Section III, Obligations of Chestnut Square, contained the following key provisions regarding the services provided by Chestnut Square to Hamilton as part of her monthly service fee: (1) water, heat and air conditioning; (2) necessary repairs, painting, maintenance and

replacement of property and equipment of Chestnut Square; (3) weekly basic interior housekeeping; (4) one meal per day was included but additional meals could be available for additional charges; (5) local transportation; (6) a 24-hour Emergency Response System; (7) access to a beauty/barber shop with additional fees for services used; (8) use of common areas and participation in social activities; (9) reservation of guest rooms at an additional fee; (10) outdoor parking; (11) limited on-site storage; (12) the ability to modify her apartment with prior written consent; and (13) healthcare services- limited home health care services through a third party; priority access to Bethany Terrace Nursing Centre; and assistance in medical emergencies.[2]

¶ 8    Section IV, Fees, covered the entrance fee, which was $123,600; the monthly service fee of $1600; underground parking space entrance fee and monthly service fee, which Hamilton did not pay; tax and special assessment obligations; and the guarantee of continued residency. Hamilton did not have a separate tax obligation; her portion of real estate taxes was included in her monthly service fee. The guarantee of continued residency provision provided that Hamilton would not be removed from residency solely based on her financial inability to pay the monthly service fee or other charges and could continue to reside at Chestnut Square if facts were established that justified deferment of charges without impairing the operation of Chestnut Square. Any deferred charges under this provision would be deducted from the entrance fee refund that may become due to Hamilton.

¶ 9    Sections V-VII governed Hamilton's transfer from her apartment. Section V, Transfers, allowed Hamilton to request a transfer from one apartment to another as well as provided for

---

[2] Bethany employs approximately 50 employees at Chestnut Square to provide the services to the residents.

Chestnut Square's assistance in arranging a transfer to Bethany Terrace Nursing Centre or the health facility of her choice if special medical or nursing care was needed. Section VI, Release of Apartment, provided for the release of the apartment if Hamilton's condition required more than a temporary transfer from the apartment. Section VII, Cost Factors Involved in Transfers, contained provisions regarding calculating the cost of various types of transfers, including transfers to an apartment with a higher or lower entrance fee.

¶ 10        Section VIII, Termination and Refund After Occupancy, contained the following key provisions: (1) Termination by Resident- the Agreement could be terminated by Hamilton at any time with written notice that specified the effective date of the termination, not less than 120 days after service of the notice; under such termination the Agreement remained in effect until the later of expiration of the 120 days or until the apartment was vacated; the monthly service fee remained in effect until the termination of the Agreement, at which time all financial obligations to Chestnut Square would cease; (2) Death of Resident- Hamilton's legal representative could terminate the Agreement upon 30 days' written notice to Chestnut Square and the estate would remain liable for the monthly services fee during that 30-day period; (3) Termination by Chestnut Square- the Agreement could be terminated by Chestnut Square for good and sufficient cause on notice,  at which time possession to the apartment would be "promptly" surrendered; (4) Refund of Entrance Fee- upon termination of the Agreement, after occupancy, Chestnut Square refunds 100% of the amount of the entrance fee paid; the refund will be paid to the resident or their estate upon re-occupancy of the apartment minus any expenses necessary to return the apartment to like-new condition; (5) Termination of Monthly Service Fee- the monthly service fee remained due and payable until the termination date or removal of the resident's personal property, whichever was last.

¶ 11    Section IX, Limitation of Rights, limited Hamilton's rights to those expressly granted in the Agreement. Specifically, the Agreement granted no proprietary interest in Chestnut Square, Chestnut Square Association, or any other assets, real or personal property of Chestnut Square or Bethany. Additionally, the Agreement noted that residency conveyed no title, legal or equitable, to the real property or improvements of Chestnut Square or Chestnut Square Association.

¶ 12    Section X, Limitations on Chestnut Square Association's Obligations, concerned Chestnut Square's property and liability insurance and stated further that its obligations were subject to fire or other casualty, war, riot, strikes, lockouts, delays, inability to obtain labor, material or supplies or other causes beyond its control.

¶ 13    Section XI contained general provisions including a subsection M on Professional Advice which stated that Hamilton's signature acknowledged that the Agreement involved significant financial, legal and tax considerations and that Chestnut Square recommended that she obtain independent tax advice concerning those matters.

¶ 14    Section XII, Explanation of Your Rights, gave Hamilton 14 days from the (1) execution of the Agreement or (2) payment of any money as a deposit or application fee, whichever occurred last, to rescind the Agreement without penalty or obligation. That section further provided that Hamilton could not be required to move into Chestnut Square until after the expiration of the 14-day rescission period.

¶ 15    In February 2013, Hamilton gave the required notice to terminate her residency, and vacated her apartment on April 26, 2013. Bethany did not refund her entrance fee until July 2014. Hamilton did not receive any interest with her entrance fee refund. Subsequent to her leaving Chestnut Square, Hamilton suffered a decline in health and became a resident of a

skilled nursing facility with 24-hour care. Plaintiff's daughter and guardian personally paid some of Hamilton's medical expenses.

¶ 16                                B. Procedural Background

¶ 17        On February 26, 2014, plaintiff filed a class action complaint against Bethany asserting claims of unconscionability, violation of the Consumer Fraud Act, violation of the Deposit Return Act, and violation of the Interest Act. On September 2, 2014, plaintiff was given leave to file an amended complaint by agreed order. Plaintiff filed her amended class action complaint, adding an additional named plaintiff, Ruth Ackerman, and an amended motion for class certification, on September 12, 2014.

¶ 18        Bethany subsequently filed a section 2-615 (735 ILCS 5/2-615 (West 2014)) motion to dismiss and strike plaintiff's amended complaint because the amended complaint did not sufficiently plead a deceptive act under the Consumer Fraud Act. On February 2, 2015, the circuit court granted Bethany's motion to dismiss the unconscionability claim with prejudice, dismissed the Consumer Fraud Act claim without prejudice and denied Bethany's motion to dismiss the Deposit Return Act and Interest Act claims.

¶ 19        On February 20, 2015, plaintiff filed a six-count second amended class action complaint, alleging breach of contract (count I), violation of the Consumer Fraud Act (count II), violation of the Deposit Return Act (count III), violation of the Interest Act (count IV); and repleading claims of unconscionability (count V), and violation of the Consumer Fraud Act (count VI) for purposes of appeal that were previously dismissed. Bethany filed its answer to the second amended complaint on March 25, 2015. Bethany simultaneously filed another section 2-615 (735 ILCS 5/2-615 (West 2014)) motion to dismiss the second amended complaint.

¶ 20        On June 9, 2015, the circuit court denied Bethany's motion to dismiss counts I and II, and granted Bethany's motion to dismiss as to counts V and VI as set forth in the previous order dismissing those counts. Bethany's amended answer to plaintiff's second amended class action complaint was filed on July 15, 2015. On October 27, 2015, Bethany filed its affirmative defenses to plaintiff's second amended complaint. Bethany raised the following affirmative defenses: (1) the entrance fee was not a security deposit within the meaning of the Deposit Return Act or the Interest Act because Bethany provided services beyond those of a landlord-tenant relationship, provided guaranteed residency, and used the entrance fee to fund its services; (2) the refund policy was fully disclosed in the Agreement which established that Bethany did not intend for plaintiff to rely on any deceptive acts; (3) plaintiffs' claims under the Deposit Return Act were barred by the statute of limitations; (4) plaintiffs' claims were barred by laches as Bethany acted in reliance of its legal right to possess the entrance fees; and (5) as both plaintiffs' were refunded their entrance fees, the claims are moot because there was no controversy for the court to decide. Plaintiff filed a motion to strike and dismiss Bethany's affirmative defenses on November 24, 2015, which the circuit court granted without prejudice on December 16, 2015. Bethany refiled its affirmative defenses on January 4, 2016.

¶ 21        Plaintiff filed a third amended motion for class certification on January 19, 2016. On April 27, 2016, the circuit court granted class certification for the Deposit Return Act and Interest Act claims but denied class certification for the Consumer Fraud Act and breach of contract claims. Hamilton was appointed as the class representative. The record indicates that on July 15, 2016, plaintiff moved to approve class notice. Bethany subsequently moved to decertify the classes, but the circuit court denied the motion on January 5, 2017. A second

motion to decertify the classes was filed on February 14, 2018, which the circuit court denied on August 14, 2018.

¶ 22    On September 17, 2018, plaintiff was substituted as the named plaintiff and class representative, and Ackerman was voluntarily dismissed. Notice of class certification was mailed to the certified classes, and seven class members opted to exclude themselves. On April 3, 2019, Bethany filed a motion for summary judgment as to all claims and plaintiff filed a cross-motion for partial summary judgment on liability under the Interest Act and Deposit Return Act claims.

¶ 23    A hearing was held on the cross-motions for summary judgment on August 14, 2019. Prior to hearing the parties' argument, the circuit court noted that the crux of the case was whether the Agreement was a lease or services agreement.

¶ 24    After hearing the arguments of both parties, the circuit court granted summary judgment in favor of Bethany on both the class claims and plaintiff's individual claims. The court first held that the Agreement was not a lease and further that, based on various provisions in the agreement, the entrance fee could not be classified as a security deposit. Specifically, the court found that it was clear that the parties entered into this Agreement where a fee would be charged for labor and services, especially for professional services; it could be terminated by either party at any time; and it was not for a fixed period of time. The circuit court concluded that the overwhelming intent of the Agreement was that Bethany would provide services to the individual who would be provided exclusive rights to occupy a particular area of the property. The circuit court then granted summary judgment on the class claims for violation of the Deposit Return Act and the Interest Act, finding that the entrance fee could not be classified as a security deposit as it was not held for property damage.

¶ 25    The circuit court then examined plaintiff's individual claims of fraud and breach of contract, finding that there was no evidence that the entrance fee was in any way misleading and no evidence to support a claim under the Consumer Fraud Act.  In short, the circuit court did not find any evidence that Bethany breached the Agreement.  After concluding that there was no genuine issue of material fact on either claim, the circuit court granted summary judgment as to the individual claims as well.  Plaintiff's timely notice of appeal was filed on September 12, 2019.

¶ 26                                                    ANALYSIS

¶ 27    On appeal, plaintiff contends that the circuit court erred in granting Bethany's motion for summary judgment on all counts and denying her motion for partial summary judgment on the class claims.

¶ 28                                          A. Standard of Review

¶ 29    The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists.  *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004).  A motion for summary judgment should only be granted if the pleadings, depositions and affidavits on file demonstrate that no genuine issues of material fact exist, and the movant is entitled to judgment as a matter of law.  *Barnard v. City of Chicago Heights*, 295 Ill. App. 3d 514, 519 (1998).  In determining whether a genuine issue as to any material fact exists, a reviewing court must view the evidence in the light most favorable to the nonmoving party.  *Barnard*, 295 Ill. App. 3d at 519.  A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts.  *Hilgard v. 210 Mittel Drive Partnership*, 2012 IL App (2d) 110943, ¶ 19.

¶ 30    On a summary judgment motion, once the moving party has demonstrated the right to judgment, the burden shifts to the nonmoving party to present evidence showing a genuine issue of material fact or that the moving party was not entitled to judgment as a matter of law. Mere argument is not enough to raise an issue of material fact. *Triple R Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 16. We review the circuit court's decision to grant summary judgment *de novo*. *Loncarevic & Associates, Inc. v. Stanley Foam Corp.*, 2017 IL App (1st) 150690, ¶¶ 23-24; *Evans v. Brown*, 399 Ill. App. 3d 238, 244 (2010).

¶ 31    Our review of the record reveals that there was no evidence of any genuine issue of material fact or showing that Bethany was not entitled to judgment as a matter of law. Nor has plaintiff raised any issue of material fact on appeal, as we discuss in more detail below.

¶ 32                    B. Cross-Motions for Summary Judgment on the Class Claims

¶ 33    Plaintiff first contends that the circuit court erred in granting Bethany's motion for summary judgment and denying her motion for summary judgment on the class claims of violation of the Interest Act and the Deposit Return Act. Specifically, plaintiff maintains that: (1) it was error to conclude that Bethany's entrance fee was not a security deposit; (2) it was error to conclude that the Agreement was primarily a service agreement and not a lease; (3) Chestnut Square was not a Life Care Facility and was therefore not exempt from the Interest Act or the Deposit Return Act; (4) it was error to conclude that the Agreement was not a lease because it was not for a fixed amount of time; and (5) Bethany's affirmative defenses were unavailing.

¶ 34    Because the parties filed cross-motions for summary judgment, they conceded that no material questions of fact existed and the only issue that needed to be decided by the court was a question of law: which could be decided on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶

28. Appellate review of the circuit court's decision as to cross-motions for summary judgment is *de novo*. *Id*. at ¶ 30.

¶ 35      In order to determine whether summary judgment was proper, we must determine if the Agreement constituted a lease and further whether the entrance fee was a security deposit. This requires us to construe the Agreement.

¶ 36      The construction of a contract is an issue of law to be determined by the court (*Intersport, Inc. v. National Collegiate Athletic Association*, 381 Ill. App. 3d 312, 318-19 (2008)) and is reviewed *de novo* (*K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1142 (2005)). Contract construction and interpretation are generally well suited to disposition by summary judgment. *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005).

¶ 37      The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 247 (2010). To determine the intent of the parties, the court must look to the instrument itself, its purpose and the surrounding circumstances of its execution and performance. *Id.* When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous. *Id.* Contract language is ambiguous when it is susceptible to more than one meaning or is obscure in meaning. *William Blair*, 358 Ill. App. 3d at 334. An ambiguity is not created by the mere fact, that, as here, the parties disagree on an interpretation. See *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App.3 d 456,469 (2004).

¶ 38      The question here is whether the Agreement was simply a lease or something more. For a lease to be valid in Illinois, "there must be agreement as to the extent and bounds of the

property, the rental price and time and manner of payment, and the term of the lease." *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 145 (1986). Additionally, this court has held that the essence of a lease was the transfer of possession, while a license merely entitles one party to use property subject to the management and control of the other party. *Cook v. University Plaza*, 100 Ill. App. 3d 753, 754 (1981) (citing *In re Application of Rosewell*, 69 Ill. App. 3d 996, 1000-01 (1979)).

¶ 39 As noted above, Hamilton entered into a contract titled "Residency and Services Agreement" with Chestnut Square for Apartment 1309A on December 1, 2004. The Agreement provided for an initial deposit of $12,300 that was paid by Hamilton to reserve a residence in Chestnut Square and would only be refunded as expressly provided in the Agreement. The total entrance fee was $123,600, and the balance was payable within 60 days of the established occupancy date or possession of the apartment. The Agreement also contained provisions related to various services that would be provided by Chestnut Square, including meals, housekeeping, resident social activities, and local transportation. The Agreement also had no expiration date; presumably, a resident could live there for their natural life barring any major medical condition that prevented them from living independently. Further, the Agreement could be terminated at any time by either party.

¶ 40 While the Agreement contained certain aspects normally associated with leases such as the reference to a specific apartment, we note that it also allowed a resident to change units on request. As noted above, there was no rental price specified; the agreement provided for an initial deposit, an entrance fee and a monthly services fee. The monthly services fee covered personal care and some assisted living services. The term was indefinite; a resident could stay for the reminder of their life, could terminate the Agreement on notice to Chestnut Square or

could relocate to another Bethany-operated facility or be assisted in moving to a health facility of their choice. Bethany expected its residents to live independently but offered added conveniences for its aging residents. We find that the Agreement went beyond the terms of a simple lease contract.

¶ 41       Additionally, in instances where Bethany was unable to meet a resident's care requirements, the Agreement provided that arrangements were made with other facilities to ensure that the care was ultimately made available to the resident, similar to arrangements at a life care facility. See *Antler v. Classic Residence Management Ltd. Partnership,* 315 Ill. App. 3d 259, 267-69 (2000).  The record does not indicate that Chestnut Square was a licensed life care facility under the Act, as noted by plaintiff. A life care facility is defined by the Life Care Facilities Act (Act) as "a place or places in which a provider undertakes to provide a resident with nursing services, medical services or personal care services, in addition to maintenance services for a term in excess of one year or for life pursuant to a life care contract.  The term also means a place or places in which a provider undertakes to provide such services to a non-resident." 210 ILCS 40/2(f) (West 2018). However, despite Chestnut Square's not providing comprehensive medical care, and contrary to plaintiff's assertion, we find that the Agreement and the residency at Chestnut Square was a continuing care residency agreement and more closely resembled a life care facility based on the many services it did provide to residents. See *Jackim v. CC-Lake, Inc.*, 363 Ill. App. 3d 759, 761-64 (2005). While there is no current statutory enactment related to continuing care facilities, this court has previously recognized such facilities that provide less care than a life care facility, including those that required the transfer of a resident's assets to the facility.  See e.g., *Franciscan Communities, Inc. v. Hamer*, 2012 IL app (2d) 110431; *Sears Bank and Trust Co. v. Holmstad, Inc.*, 132 Ill. App. 3d 229

(1985); *Piel v. Norwegian Old People's Home Society of Chicago*, 127 Ill. App. 3d 593 (1984). Accordingly, we find that the Agreement created much more than a simple landlord-tenant relationship between the parties and therefore the Agreement was not a lease.

¶ 42     It follows then, that the Interest Act and Deposit Return Act do not apply to the entrance fee. Parties are only covered by the statutes if the agreement between the residents and Chestnut Square can be considered a lease. See *Cook*, 100 Ill. App. 3d at 755. We have previously described a security deposit as money a tenant deposits with a landlord as security for the tenants full and faithful performance of the lease terms. *Steens v. MAC Property Management, LLC*, 2014 IL App (1st) 120719, ¶ 21. Under the terms of a lease agreement, a security deposit remains the tenant's property which the landlord holds in trust for the tenant's benefit subject to the tenant fulfilling its obligations under the lease. *Id.*

¶ 43     Section 1 of the Interest Act provides in relevant part that a lessor of residential real property containing 25 or more units in a single building or complex who receives a security deposit from a lessee to secure the payment of rent or compensation for damage to property shall pay interest to the lessee on any deposit held by the lessor for more than six months. 765 ILCS 715/1 (West 2014). Similarly, Section 1(a) of the Deposit Return Act provides that a lessor of residential real property containing five or more units who has received a security deposit from a lessee to secure the payment of rent or to compensate for damage to the leased premises shall return the security deposit in full within 45 days of the date that the lessee vacated the premises. 765 ILCS 710/1(a) (West 2014).

¶ 44     In this case, our review of the record reveals no evidence that would support classification of the entrance fee as a security deposit. The entrance fee was not held to secure the payment of rent or as compensation for damage to property; instead, per the Agreement, it was held to

cover the resident's continued residency and the various services provided by Bethany during such occupancy, regardless of whether the resident was able to pay the monthly services fee.

¶ 45     Moreover, the Agreement expressly stated that Chestnut Square would pay interest on the initial deposit at the passbook savings rate established by Bank One. The initial deposit, along with interest that accrued on it, was applied to the entrance fee. Deposition testimony of one of Bethany's employees, Vera, indicated that Hamilton was allowed to "spend down" part of her entrance fee on medical expenses. We conclude, as a matter of law, that the entrance fee was not a security deposit, and that summary judgment was properly granted in Bethany's favor on those class claims.

¶ 46                              C. Summary Judgment – Individual Claims

¶ 47     Plaintiff also contends that the circuit court erred in granting Bethany's motion for summary judgment as to her individual claims of fraud under the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)) and breach of contract.

¶ 48     As stated previously, when reviewing a circuit court's ruling on a motion for summary judgment, the appellate court examines the record anew to determine whether a material question of fact exists. *CE Design, Ltd. v. Speedway Crane, LLC*, 2015 IL App (1st) 132572, ¶¶ 20; *Coole v. Central Area Recycling,* 384 Ill. App. 3d 390, 396 (2008). We review the circuit court's decision to grant summary judgment *de novo*. *Loncarevic & Associates*, 2017 IL App (1st) 150690, ¶¶ 23-24. We examine each of plaintiff's individual claims in turn.

¶ 49                              1. Fraud Claims

¶ 50     With respect to her fraud claims, plaintiff contends that the circuit court erred in finding that there was no evidence that the entrance fee was in any way misleading under the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)).  Plaintiff claims the court erred because the

Agreement is both deceptive and unfair; while it states that the entrance fee will be refunded only when the apartment is re-occupied by a new tenant, it fails to disclose that the time for re-occupancy is generally a year or more. Plaintiff contends that the length of time for re-occupancy, longer than for ordinary apartments, is material and its omission is deceptive. Plaintiff asserts that the omission of a material fact can be the basis for a claim of fraudulent concealment.

¶ 51    It appears that plaintiff conflates fraud claims under the Consumer Fraud Act with common law claims of fraudulent concealment. "To prove fraudulent concealment, a plaintiff must establish that: (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages." *Phillips v. DePaul University*, 2014 IL App (1st) 122817, ¶ 82, (quoting *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005)).  To assert a claim for fraudulent concealment, plaintiff must establish the existence of a special or fiduciary relationship, which in turn gives rise to a duty to speak. *Phillips*, 2014 IL App (1st) 122817, ¶ 83.

¶ 52    Plaintiff has made no such showings here.  First, the record does not indicate that the refund policy was concealed; the policy was clearly stated in the Agreement. Although the Agreement did not contain a specific timeline for when the refund would occur, it did state "upon re-occupancy of the apartment."  There is nothing in the record that suggests Hamilton was prevented from making a reasonable inquiry as to the average or usual timeline of such refund

if she decided to end her residency, nor was there any suggestion that Hamilton was prevented from having the Agreement inspected by a family member or legal counsel before signing it. In short, plaintiff's only argument to support her claim of fraudulent concealment is the delay of the refund itself. This argument does not satisfy the requirement of a genuine issue of material fact that is necessary to avoid summary judgment, as mere argument is not enough to raise an issue of material fact. *Triple R Development, LLC*, 2012 IL App (4th) 100956, ¶ 16.

¶ 53    Plaintiff further contends that Bethany's practice was unfair under the Consumer Fraud Act because Hamilton had no way of knowing the typical re-occupancy timeline, nor did she have any meaningful control over re-occupancy of the apartment. Plaintiff maintains that the Agreement is a nonnegotiable adhesion contract, the tenants are senior citizens, and the entrance fee provision is buried in the contract without full disclosure of the likely waiting period of a year or more. Plaintiff further argues that Bethany's residents would reasonably, but wrongly, assume that Bethany uses the four-month termination period to begin remarketing the unit and prepare the refund. Plaintiff concludes that the deprivation of Hamilton's entrance fee for more than a year is the kind of unreasonable burden the Consumer Fraud Act is designed to prevent. We disagree.

¶ 54    "The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Cripe v. Leiter*, 184 Ill. 2d 185, 190-91 (1998). It is to be liberally construed to effectuate its purpose. *Id.* at 191. Section 10a(c) of the Consumer Fraud Act authorizes a private right of action for "[a]ny person who suffers actual damages as a result of a violation of [the] Act." 815 ILCS 505/10a(a) (West 2018); *Krautsack v. Anderson*, 223 Ill. 2d 541, 553 (2006).

¶ 55        Section 2 of the Consumer Fraud Act describes unfair or deceptive practices as:

> "including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or admission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce * * *." 815 ILCS 505/2 (West 2014).

¶ 56        Consequently, to sustain a deceptive practice claim under the Consumer Fraud Act, the pleader must allege "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Evitts v. Daimler-Chrysler Mot. Corp.,* 359 Ill. App. 3d 504, 508 (2005) (citing *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A*., 186 Ill. 2d 472, 492 (1999)). Additionally, a valid claim must show that the fraud proximately caused an injury to the plaintiff. *Kelly v. Sears Roebuck and Co*., 308 Ill. App. 3d 633, 641 (1999).

¶ 57        Here, plaintiff has not provided any written or verbal statement by any Bethany employee or agent at any point during Hamilton's residency indicating that the entrance fee would be either returned immediately upon notice of moving or within 120 days. Additionally, the timeliness of returning the entrance fee only became deceptive to plaintiff because she assumed a promise that was never made. Under plaintiff's theory, any resident's unprompted assumption could become the basis for a deceptive practice claim. This would be an overly broad interpretation of the Consumer Fraud Act, and this court has determined that the Consumer Fraud Act is not intended to be used as a vehicle for transforming nondeceptive, nonfraudulent conduct into actionable conduct. See *Kellerman v. Mar–Rue Realty & Builders*

*Inc.,* 132 Ill. App. 3d 300, 306 (1985). Thus, we find that Hamilton's assumption does not transform the refund policy into an unfair or deceptive practice.

¶ 58 Similarly, plaintiff has been unable to demonstrate that the delay in refunding the entrance fee proximately caused an injury to Hamilton. Our supreme court has held that a plaintiff must establish that he was actually deceived by the defendant's representations or omissions in order to establish proximate causation. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 200 (2005). Plaintiff has made no such showing here. Although the record certainly indicates that the delay resulted in certain difficulties for Hamilton because she subsequently became ill after moving out of Chestnut Square and later suffered a financial hardship by not having the use of the entrance fee refund, such difficulties did not *ipso facto* result from deception.

¶ 59 Based on the record before us, it is clear that there was no genuine issue of material fact as to whether Bethany's refund policy violated the Consumer Fraud Act, but only a dispute as to the interpretation of the facts. See *Borgenson v. Fairhaven Christian Home*, 1 Ill. App. 3d 323, 326 (1971). That is, it is undisputed that the parties signed the Agreement which contained certain provisions, but the parties disagree as to how the agreement should be interpreted: fraudulent or not. Thus, we conclude that the circuit court properly granted summary judgment on plaintiff's consumer fraud claim.

¶ 60                                    2. Breach of Contract Claim

¶ 61 Lastly, plaintiff contends that the circuit court erred in granting Bethany's motion for summary judgment on her breach of contract claim. Specifically, she argues that Bethany's delay in marketing the apartment and the lengthy re-occupancy period which led to Hamilton's

financial hardship frustrated Hamilton's objectives under the Agreement and violated the Agreement's implied duty of good faith and fair dealing.

¶ 62       The essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 85. The duty of good faith and fair dealing is implied in every contract and requires a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of parties. *Seip v. Rogers Raw Materials Fund, L.P.*, 408 Ill. App. 3d 434, 443 (2011). The duty, however, is not an independent source of duties for the parties to a contract, and is "used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Id.*, (quoting *Fox v. Heimann*, 375 Ill. App. 3d 35, 42 (2007)).

¶ 63       Here, plaintiff does not allege that Bethany breached any parts of the Agreement as written. There is also no issue regarding construction of the contract where we must determine the intent of the parties. Nor does plaintiff allege any issue of material fact regarding her claim for breach of contract; only the dispute concerning her interpretation of the facts in the case. Such argument is insufficient to establish that an issue of material fact exists or that plaintiff is entitled to judgment as a matter of law to overcome summary judgment. Accordingly, summary judgment was properly granted in favor of Bethany on plaintiff's breach of contract claim.

¶ 64       In summary, we conclude that the circuit court properly granted summary judgment in favor of Bethany on the class claims as a matter of law where the Agreement was not a lease

subject to the provisions of the Interest Act or Deposit Return Act. Additionally, where the record fails to disclose any disputed issues of material fact in this case, and plaintiff has not established that Bethany was not entitled to judgment as a matter of law on her individual claims, summary judgment was proper.

¶ 65                                    CONCLUSION

¶ 66        For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 67        Affirmed.